Filed 12/13/11 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2011 ND 231

In the Matter of J.T.N.

Wade Enget, State’s Attorney, Petitioner and Appellee

v.

J.T.N., Respondent and Appellant

No. 20110067

Appeal from the District Court of Mountrail County, Northwest Judicial District, the Honorable Todd L. Cresap, Judge.

AFFIRMED.

Opinion of the Court by Crothers, Justice.

Wade G. Enget (argued), State’s Attorney, 18 Railroad Avenue, P.O. Box 369, Stanley, ND 58784-0369, petitioner and appellee.

Steven M. Light (argued) and Daniel Edward Hopper (appeared), 300 NP Avenue, Suite 201, Fargo, ND 58102, for respondent and appellant.

Matter of J.T.N.

No. 20110067

Crothers, Justice.

[¶1] J.T.N. appeals a district court order finding he remains a sexually dangerous individual and denying his petition for discharge from the North Dakota State Hospital.  J.T.N. argues the district court erred by determining he remains a sexually dangerous individual.  We affirm.

I

[¶2] In February 2005, the State petitioned to commit J.T.N. as a sexually dangerous individual under N.D.C.C. ch. 25-03.3.  J.T.N. was committed to the State Hospital in July 2005.  He petitioned for discharge in June 2006.  His petition was denied in November 2006.  J.T.N. filed a second petition for discharge in October 2007 and withdrew the petition in April 2008.  J.T.N. filed a third petition for discharge in January 2009 and withdrew that petition in September 2009.  In February 2010, J.T.N. filed the petition at issue in this appeal.  The district court held a two-

day hearing in November 2010.  

[¶3] At the hearing, the State called two witnesses, Dr. Robert Lisota, a State Hospital psychologist, and Michelle Richardson, a State Hospital employee.  Dr. Lisota testified J.T.N. remained a sexually dangerous individual.  Richardson testified she found J.T.N. naked in his room one night during her midnight and 1:00 am rounds and wrote-up J.T.N. for flashing.  J.T.N. called five witnesses, Dr. Robert Riedel, an independent psychologist appointed by the district court, and Dr. Terence Campbell, Dr. Stacey Benson, Dr. Luis Rosell and Dr. Joseph Plaud, four psychologists hired by J.T.N.  All five of J.T.N.’s experts testified J.T.N. was not a sexually dangerous individual.  In February 2011, the district court issued an order finding J.T.N. remained a sexually dangerous individual and continuing his commitment.

II

[¶4] “At a discharge hearing, the State has the burden of proving by clear and convincing evidence that the committed individual remains a sexually dangerous individual.”  
Matter of Midgett
, 2010 ND 98, ¶ 7, 783 N.W.2d 27.  To meet its burden, the State must prove three statutory elements and establish an additional constitutional requirement that is not a fourth element, but “is a part of the definition of a ‘sexually dangerous individual.’”  
Id.
 at ¶ 9.  Section 25-03.3-01(8), N.D.C.C., defines a “sexually dangerous individual” as: 

“an individual [1] who is shown to have engaged in sexually predatory conduct and [2] who has a congenital or acquired condition that is manifested by a sexual disorder, a personality disorder, or other mental disorder or dysfunction [3] that makes that individual likely to engage in further acts of sexually predatory conduct which constitute a danger to the physical or mental health or safety of others.” 

[¶5] In addition, in accordance with the plain language of the statute and to address constitutional due process concerns, this Court 

“construe[s] the definition of a sexually dangerous individual to mean that proof of a nexus between the requisite disorder and dangerousness encompasses proof that the disorder involves serious difficulty in controlling behavior and suffices to distinguish a dangerous sexual offender whose disorder subjects him to civil commitment from the dangerous but typical recidivist in the ordinary criminal case.”  

Matter of G.R.H.
, 2006 ND 56, ¶ 18, 711 N.W.2d 587.

[¶6] This Court applies a “modified clearly erroneous” standard of review to commitments of sexually dangerous individuals under N.D.C.C. ch. 25-03.3.  
Midgett
, 2010 ND 98, ¶ 6, 783 N.W.2d 27.  

“We will affirm a trial court’s order denying a petition for discharge unless it is induced by an erroneous view of the law or we are firmly convinced it is not supported by clear and convincing evidence.  In reviewing the trial court’s order, we give great deference to the court’s credibility determinations of expert witnesses and the weight to be given their testimony.  The trial court is the best credibility evaluator in cases of conflicting testimony and we will not second-guess the court’s credibility determinations.”

Matter of Wolff
, 2011 ND 76, ¶ 5, 796 N.W.2d 644 (internal quotations and citations omitted).  “When witnesses give conflicting testimony, we do not decide to believe a witness different from the one believed by the district court.”  
Hill v. Weber
, 1999 ND 74, ¶ 12, 592 N.W.2d 585.  “A fact finder need not believe the greater number of witnesses.”  
Id.

III

[¶7] J.T.N. argues the district court erred by denying his discharge petition because five of the six experts testified he is not a sexually dangerous individual.  He does not contest the findings that he engaged in sexually predatory conduct and that he has an antisocial personality disorder.  He argues the findings that he is likely to engage in further acts of sexually predatory conduct and that he has serious difficulty controlling his behavior were clearly erroneous.  The State responds that the district court’s findings were supported by clear and convincing evidence.

[¶8] Claims that a district court improperly relied on the opinion of one expert instead of another challenge the weight the evidence was assigned, not the sufficiency of the evidence.  
Matter of Hehn
, 2008 ND 36, ¶ 22, 745 N.W.2d 631.  Because “[e]valuation of credibility where evidence is conflicting is solely a trial court function[,]” this Court will not reweigh expert testimony.  
Id.
 at ¶ 23 (quoting 
Alumni Ass’n v. Hart Agency, Inc.
, 283 N.W.2d 119, 121 (N.D. 1979)).  We consistently have declined to “second-guess the credibility determinations made by the trial court” in sexually dangerous individual proceedings.  
Hehn
, at ¶ 23.  
See
 
Wolff
, 2011 ND 76, ¶¶ 5, 13-14, 796 N.W.2d 644; 
Interest of G.L.D.
, 2011 ND 52, ¶¶ 5-10, 795 N.W.2d 346; 
Matter of A.M.
, 2010 ND 163, ¶¶ 19-21, 787 N.W.2d 752; 
Matter of  Hanenberg
, 2010 ND 8, ¶¶ 17-18, 777 N.W.2d 62; 
Matter of T.O.
, 2009 ND 209, ¶¶ 8-11, 776 N.W.2d 47; 
Matter of Vantreece
, 2009 ND 152, ¶¶ 4, 18, 771 N.W.2d 585; 
Matter of A.M.
, 2009 ND 104, ¶¶ 10, 20, 766 N.W.2d 437; 
Matter of R.A.S.
, 2009 ND 101, ¶ 10, 766 N.W.2d 712; 
Matter of G.R.H.
, 2008 ND 222, ¶¶ 7, 11, 758 N.W.2d 719; 
Matter of M.D.
, 2008 ND 208, ¶¶ 7, 11, 757 N.W.2d 559; 
Hehn
, at ¶¶ 22-24.  “We have further explained that a choice between two permissible views of the weight of the evidence is not clearly erroneous.”  
Wolff
, at ¶ 14. 

A

[¶9] J.T.N. argues the district court erred by finding he is likely to engage in further acts of sexually predatory conduct.  “[T]he phrase ‘likely to engage in further acts of sexually predatory conduct’ as used in N.D.C.C. § 25-03.3-13 means that the respondent’s propensity towards sexual violence is of such a degree as to pose a threat to others.”  
Interest of M.B.K.
, 2002 ND 25, ¶ 18, 639 N.W.2d 473.  To determine whether the element is met, experts and courts may “use the fullness of their education, experience and resources available to them in order to determine if an individual poses a threat to society.”  
Matter of Voisine
, 2010 ND 17, ¶ 14, 777 N.W.2d 908 (quoting 
M.B.K.
, at ¶ 18).  “[A]ll relevant conduct should be considered.”  
Voisine
, at ¶ 14. 

[¶10] To determine whether J.T.N. was likely to engage in further acts, the district court specified that it “did take in all relevant conduct.”  The district court organized J.T.N.’s relevant conduct under three headings: (1) history of offenses, (2) recent conduct and treatment and (3) actuarial testing.  Under history of offenses, the district court listed several instances of J.T.N.’s sexual conduct as a juvenile and as an adult, including convictions for gross sexual imposition and sexual assault, instances of sexually predatory conduct not resulting in criminal charges and probation violations due to prohibited sexual conduct.  Under recent conduct and treatment, the district court noted J.T.N.’s violations of State Hospital rules, his lack of progress in treatment and his waiver of his 2009 review hearing.  The rules violations included possessing a cellular telephone containing pictures of a naked woman’s torso, possessing a hand drawing of a woman in lingerie, exposing himself to Richardson and causing a “near riot” by urging other patients not to participate in treatment.  Concerning J.T.N.’s treatment, the district court noted J.T.N. was in the lowest level of treatment, was in the highest security area, did not fully cooperate when he attended treatment and believed he did not need sex offender treatment.  Finally, under actuarial testing, the district court stated,

“All of the professionals engaged in actuarial testing of [J.T.N.].  The purpose of this actuarial testing is an attempt to objectively quantify the risk of reoffending.  The actuarial tests used were the Static-99R as well as the MnSOST-R actuarial test.  These tests were not used by all of the experts. . . .  

“The experts presented varying percentage estimations as to the likelihood of [J.T.N.] reoffending within a given period of time.  This testimony was based mainly upon the Static-99R actuarial as the experts tended to agree the MnSOST recidivism rate estimates were not accurate.  However, the experts who administered the tests did seem to agree that the classification and/or categorization of the offender as reached by those tests were accurate.  [J.T.N.]’s actuarial scores on the Static-99R, whether a 6 or a 7, ranked him in the high category of risk for recidivism.  Likewise, of the three experts who scored [J.T.N.] on the MnSOST-R, he also fell into the high risk category.” 

All of the factors cited by the district court were supported by the testimony or the report of at least one psychiatrist testifying at J.T.N.’s discharge hearing.

[¶11] After citing the relevant factors, the district court explained its finding that J.T.N. was likely to engage in further acts of sexually predatory conduct:

“It is believed by the Court that the above factors show, by a clear and convincing evidence, that [J.T.N.]’s condition makes him likely to engage in further acts of sexually predatory conduct which constitutes a danger to the physical or mental health or safety of others.  In looking at the past history of [J.T.N.] it is evident that, since approximately age 11, [J.T.N.] has had no extended period of time, when he has been free from confinement, in which [he] has not been engaged in some sort of sexually inappropriate conduct.  [J.T.N.]’s sexually inappropriate conduct ranges from the highly inappropriate kissing of a 13 year old girl by a 20 year old man, to Gross Sexual Imposition findings when [J.T.N.] was young.  [J.T.N.] has proven, time and time again, that he is unable to control his impulses and urges without severe restrictions being placed on his freedom.  Whether this is the result of a paraphilia diagnosis or an antisocial personality diagnosis, the condition still manifests itself in sexual offenses.  Therefore, the Court relies on those offenses as set forth in the prior history as an indicator of the predicted conduct of [J.T.N.] if he were simply released without any supervision.

“The experts who testified on [J.T.N.]’s behalf indicate that the Court should not rely on the juvenile offenses.  The argument of these experts is that the prior conduct of [J.T.N.] is not a predictor of his future conduct now that he is an adult. 

“There are two problems with this theory.  First, [J.T.N.] committed a number of these inappropriate acts while he was between the ages of 18 and 20.  Even when [J.T.N.] was faced with revocation of his probation, within 24 hours of bonding out on a probation revocation allegation, he reoffended. 

“Secondly, even if you were to accept the premise of these experts as being true, the recent conduct of [J.T.N.] indicates that he cannot control his actions and that he is likely to reoffend.  [J.T.N.] has had repeated violations of rules while in the secure confines of the North Dakota State Hospital.  These violations include violations which are sexual in nature.  Specifically, [J.T.N.] possessed a cell phone with pornographic material on it and further, on two separate occasions within one hour of each other, [J.T.N.] exposed himself to a female worker at the State Hospital.  These are in addition to the other indications of [J.T.N.]’s lack of control such as the incident where he urged other residents to be noncompliant.

“In addition to those two factors there is a third concern present. . . . Specifically, [J.T.N.] is presently at the lowest level of treatment possible in the Sex Offender Treatment Program and is at the most restrictive level concerning his own personal freedoms at the State Hospital. . . . 

. . . .

“The experts who testified on behalf of [J.T.N.] indicated that further treatment would not be productive or, alternatively, substantially decrease the likelihood of [J.T.N.] reoffending.  Dr. Rosell testified that [J.T.N.] could be simply growing tired of the same stage of treatment over and over and that there would be no light at the end of the tunnel.  However, Dr. Rosell stated in his written report that treatment participation also decreases [J.T.N.]’s risk.  Dr[.] Riedel also testified that [J.T.N.] knows what Sexual Offender Treatment entails.  Essentially, he implied that [J.T.N.] already has the tools he needs to be successful.  However, Dr. Riedel did acknowledge that completion of treatment was not left to the decision of the participant.

“The Court finds more credible Dr. Lisota’s opinion that ‘There is no reason to believe that in the absence of intensive treatment, a personality disorder would cease to exist after it has been conclusively diagnosed.’  It makes even less sense to the Court that [J.T.N.]’s argument (i.e. treatment is unnecessary) is to be believed when [J.T.N.] through his experts indicates that, if released, [J.T.N.]’s plan would be to voluntarily go to treatment to lessen the risk of reoffending.

“In addition to these factors, the Court relies on the actuarial test results to the extent that they classify, consistently, the risk of [J.T.N.] reoffending as being high.  While the experts seem to be in two different camps with respect to the percentage of risk of reoffense of [J.T.N.], they all concurred that it was a high risk.  Given the other factors of risk in terms of past history of [J.T.N.], the recent conduct of [J.T.N.] while at the North Dakota State Hospital, and the lack of any treatment progression by [J.T.N.], the Court finds that an exact quantification of percentage risk of reoffending is not useful nor necessary for a determination in this matter.

“Accordingly, once again, the Court finds that the State has satisfied [its] burden of proving that, by clear and convincing evidence, [J.T.N.]’s condition makes him likely to engage in further acts of sexually predatory conduct which constitutes a danger to the physical or mental health or safety of others.”

[¶12] The district court gave more weight to Dr. Lisota’s testimony and report than it gave to the testimony and reports of J.T.N.’s experts.  The district court made detailed findings, including credibility determinations and references to the evidence relied on.  
See
 
Interest of L.D.M.
, 2011 ND 25, ¶ 6, 793 N.W.2d 778.  We conclude the district court’s finding that J.T.N. was likely to engage in further acts of sexually predatory conduct was not clearly erroneous because we are not firmly convinced the finding was not supported by clear and convincing evidence.

B

[¶13] J.T.N. argues the district court erred by finding he has serious difficulty controlling his behavior.  To determine whether an individual has serious difficulty in controlling behavior, all relevant conduct may be considered.  As the United States Supreme Court explained in 
Kansas v. Crane
, 534 U.S. 407, 413 (2002),

“‘[I]nability to control behavior’ will not be demonstrable with mathematical precision.  It is enough to say that there must be proof of serious difficulty in controlling behavior.  And this, when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case.”

[¶14] To support its finding that J.T.N. had serious difficulty controlling his behavior, the district court relied on J.T.N.’s recent conduct and treatment.  The district court stated,

“The final requirement in the committal process is for the State to prove, by clear and convincing evidence, that [J.T.N.] has serious difficulty controlling his behavior.  The Court relies on those actions of [J.T.N.] as set forth immediately above which outlines [J.T.N.]’s conduct while a patient at the State Hospital.  The outline of those actions show[s] that [J.T.N.] has continued to engage in noncompliant behavior which is not only of a disruptive nature, it is also sexually explicit in nature.  These actions occur in an environment in which [J.T.N.] is under constant supervision.  The possession of cell phones, the possession of pornography on the cell phones, the inciting of a riot, the sleeping in the nude and flashing the staff person and other allegations of inappropriate touching show that he cannot control his behaviors.  Furthermore, his unwillingness to participate in treatment is further evidence [J.T.N.] is unable to control his own actions if nothing more than to satisfy those requirements that have been clearly set forth to him that would allow him to progress in a positive manner.  However, other than attending group, [J.T.N.] has been completely noncompliant in making any progress towards obtaining the treatment goals set for him by the staff at the State Hospital.  Rather, [J.T.N.] participates only to the extent that he wants to.

“Further, it concerns the Court greatly that [J.T.N.] does not believe himself to be a sexually dangerous individual nor does he believe himself to be in need of any treatment.  This is in spite of the fact that he proposes, as part of his assurance to the Court that he is no danger upon being released, that he will participate in treatment. . . .  Given that he has serious difficulty controlling his behavior in the very restrictive environment of the State Hospital, the Court believes that he will have even less ability to control his behavior once all restrictions have been lifted.  Accordingly, the Court finds, by clear and convincing evidence, that the State has shown that [J.T.N.] has serious difficulty controlling his behavior.”

[¶15] In its analysis, the district court referenced allegations of inappropriate touching not previously mentioned in the order.  As with the other factors relied on by the district court, the allegations were supported by evidence in the record, specifically, testimony by Dr. Lisota regarding an incident during which J.T.N. conducted a “simulated pat-down” on a State Hospital employee.  As in its determination that J.T.N. was likely to engage in further acts of sexually predatory conduct, the district court made detailed findings based on evidence in the record to support its finding J.T.N. has serious difficulty controlling his behavior.  We conclude the district court’s finding was not clearly erroneous because we are not firmly convinced that it was not supported by clear and convincing evidence.  

IV

[¶16] J.T.N. argues the district court applied an erroneous view of the law for three reasons.  First, he argues the statement in the district court order “that the ‘plain statutory language applicable to this situation clearly indicates that a personality disorder satisfies the second test under the statute’ . . . is in direct contrast with this Court’s decision in 
Midgett
, which stated a ‘diagnosis of antisocial personality disorder alone is not sufficient to establish a connection between the disorder and future dangerousness.’”  2010 ND 98, ¶ 24, 783 N.W.2d 27.  While J.T.N. correctly asserts an antisocial personality disorder cannot be the sole basis for finding an individual has serious difficulty in controlling behavior, he takes the district court order out of context.  The language quoted by J.T.N. appears in the order under the heading, “Presence of a Congenital or Acquired Condition that is Manifested by a Sexual Disorder, a Personality Disorder or other Mental Disorder.”  J.T.N.’s antisocial personality disorder was not the basis of the district court’s finding that J.T.N. has serious difficulty controlling his behavior.  Rather, the district court stated the personality disorder satisfied the statutory requirement that J.T.N. “ha[d] a congenital or acquired condition that is manifested by a sexual disorder, a personality disorder, or other mental disorder or dysfunction.”  N.D.C.C. § 25-03.3-01(8).  J.T.N.’s argument that the district court improperly relied on his antisocial personality disorder to support its finding that he has serious difficulty controlling his behavior is without merit.

[¶17] Next, J.T.N. argues the district court misapplied the law by “rel[ying] on those offenses as set forth in the prior history as an indicator of the predicted conduct of [J.T.N.] if he were simply released without any supervision.”  J.T.N. asserts, “This goes against this Court’s decision that these hearings do not involve prior proceedings, but rather require the State to bear the burden of proving by clear and convincing evidence that J.T.N. remains a sexually dangerous individual at this time. [
Interest of M.D.
, 1999 ND 160, ¶¶ 29-30, 598 N.W.2d 799].”  J.T.N.’s assertion is not supported by 
M.D.
 and is contrary to N.D.C.C. ch. 25-03.3.  In 
M.D.
, the appellant argued the evidence presented at his commitment hearing was insufficient to show he was likely to engage in further acts of sexually predatory conduct.  
Id.
 at ¶ 36.  This Court held the finding was supported by sufficient evidence, including a prior conviction and probation violation.  
Id.
 at ¶ 37.  Further under N.D.C.C. § 25-

03.3-15, “[n]otwithstanding any other provision of law, in any proceeding pursuant to this chapter, evidence of prior sexually predatory conduct or criminal conduct, including a record of the juvenile court, is admissible.”  J.T.N.’s argument the district court improperly relied on his prior offenses is without merit. 

[¶18] Finally, J.T.N. argues the district court erroneously relied on his actuarial test scores.  We have stated that “[t]he raw scores provided through diagnostic tools should not overshadow the ultimate diagnoses and opinions of the expert witnesses.”  
Interest of P.F.
, 2006 ND 82, ¶ 22, 712 N.W.2d 610.  However, the district court did not err by considering J.T.N.’s raw scores as one of many factors supporting its conclusion that J.T.N. remains a sexually dangerous individual.  All three of J.T.N.’s arguments fail.  The district court did not apply an erroneous view of the law in determining J.T.N. remains a sexually dangerous individual.

V

[¶19] We affirm the district court order denying J.T.N.’s petition for discharge and continuing his commitment as a sexually dangerous individual.

[¶20] Daniel J. Crothers

Mary Muehlen Maring

Dale V. Sandstrom

Gerald W. VandeWalle, C.J.

Kapsner, Justice, dissenting.

[¶21] I respectfully dissent.

[¶22] Five qualified experts testified that J.T.N. does not meet the criteria to continue his commitment as a sexually dangerous individual.  One expert testified that he does.  Evaluating testimony is not a matter of numbers, and a fact finder is entitled to assess the credibility of the witnesses.  But when the testimony of Dr. Lisota is reviewed, his credibility is so undermined by his own acknowledgments that his conclusions are not accepted under psychological standards that I am left with a definite and firm conviction that a mistake has been made.

[¶23] Dr. Lisota, alone of the experts, testified that J.T.N. had a sexual disorder, diagnosable as an Axis I disorder, which he described as Paraphilia (Nonconsent) with frotteuristic and exhibitionistic features.  However, on cross-examination, Dr. Lisota had to acknowledge that neither the diagnosis nor the features were supported by the criteria established for such diagnosis in the standard diagnostic manual generally accepted by psychologists and psychiatrists.

[¶24] Regarding his Paraphilia NOS Axis I disorder, Dr. Lisota testified on cross-

examination:

A. Axis I disorders typically do wax and wane, especially given [J.T.N.’s] age and the time that he’s been civilly committed.  He’s still growing and developing and evolving as an individual and his sexuality is a—a component of that.

Q. Has [J.T.N.] had any new behaviors in the last eight years that would fit with that disorder?  Any new behaviors?

A. What— 

Q. First we’ll talk about the Paraphilia NOS?

A. With the nonconsent?

Q. Yes?

A. I guess, technically, the touching of staff, other than that, no.

Q. I don’t want you to guess.  I’d like you to base it upon— 

A. Okay.

Q. Okay, so, without guessing?

A. Merely the— yes—merely the inappropriate touching of staff.

Q. What was that touching?

A. That was a—simulate—he was touching the staff’s leg in a simulated pat-down.

Q. A simulated pat-down?

A. Yes.

Q. Okay.  And where was the touching occurring, the knee, the thigh, the groin area?

A. Just the leg.  I don’t know.

Q. Just the leg, and did that occur—where was it, sitting around a table and—where there was a discussion going on?

A. No.

Q. Okay.  Do you know how that occurred, or where it was?

A. I believe—I don’t know where it occurred, but I believe that it occurred in a unit transfer of sorts, where a pat-down was taking place.

Q. Now, with respect to your testimony that the nonconsent is being referred, or I should say proposed in the DSM-V, the next edition of the manual?

A. Yes.

Q. Isn’t there also a requirement with that diagnosis that the person have a minimum of three rapes?

A. Yes, there is.

Q. How many has [J.T.N.] had?

A. [J.T.N.] would not meet criteria, proposed criteria, for Paraphiliac Coercive Disorder as it now stands in the DSM-V.

Q. Okay, and Paraphiliac non—Coercive Disorder is the same as what you are referring to as rape nonconsent?

A. Right.

Q. Okay. Now, doctor, and that’s—you’re saying that’s his diagnosis today, but if the new proposed legislature—I should say the new proposal is accepted by the DSM-V he would not fit the criteria for that.  Correct?

A. He would not meet full criteria for it.

Q. Right.  Okay.  Now, who is the individual who came up with the whole idea of NOS Nonconsent?

A. Well, that depends on who you talk to.  I believe if you go back in the literature that—that begins to become prominent, or at least a topic of interest, certainly with Abel and Roul.

Q. Would you believe that Dr. Dennis Doren who has testified for the State of North Dakota for these proceedings in the past, is an authoritative figure in this area?

A. Yes.

Q. In fact, he, would you say that within the last, oh let’s just go last five years has been the number one advocate, or strong advocate, I should say, for its inclusion in the DSM-IV?

A. In the DSM-V?

Q. Or I should say is a strong advocate for the position in general, period.  He’s saying that this is a condition that’s there and it’s valid.  Would you say that Dr. Doren—

A. Yes, I believe that’s his position.

Q. Okay.  What are the criteria that Dr. Doren, as you’ve indicated, the expert in the area relies upon when making a finding or determination of whether or not an individual fits for that diagnosis?

A. He has a—an extensive list of suggested criteria.

. . . .

Q. Okay.  Well, do you recall that the first criteria suggested by Dr. Dennis Doren, for NOS Nonconsent, is ejaculation or other clear signs of sexual arousing, arousal, during events that are clearly nonconsentual?

A. Yes.

Q. Does it fit [J.T.N.]?

A. Historically, that appears to.

Q. Where?  Where is the evidence that supports that?

A. The victim’s account in his curtain and, let’s see, there—he clearly had an erection in the incident involving at least one of the children.

Q. One of the children was six years old and sleeping and fondled at that time?

A. Right.

Q. And there is evidence, you’re telling me, that at that point that there was ejaculation or other clear signs of sexual arousal?  You—you—you are testifying that that’s in the record?

A. My records indicate that [J.T.N.] reported that he had an erection at that time.

Q. Okay.  Now, the second criteria, do you recall it being repetitive patterns of actions as if scripted, or scripts?

A. Yes.

Q. Okay.  How does that fit [J.T.N.]?

A. Well, when you look at what he was doing in terms of nonconsent sexual activity, there does appear to be a—a pattern of behavior there?

Q. What are the patterns that were scripted?  Would that not mean that they’re all very similar?  As if planned out?

A. Oh, I don’t think they’re planned out, in that sense, it really goes more to, here’s an opportunity, yes, no, maybe, either way.

Q. Either way on that one?

A. Yes.

Q. The third one.  Virtually all of the person’s criminal behavior is sexual?

A. There I would—

Q. It doesn’t fit, does it?

A. No, and I would have to disagree with Dr. Doren on that.

Q. Okay.  I’ll make a note of that.  Now for raping when the victim had already been willing to have consensual sex, clearly not the case here?

A. No.

Q. Now, fifth one, a short time period after consequences before raping again?

A. Not that I’m aware of.

Q. Okay.  Now, raping under circumstances with high likelihood of being caught.  Also would not apply in the history of this case?

A. I think the—a curtain incident.

Q. We’re talking about raping, now, you did testify, you said that he was—it was with GSI that he was originally charged with.  Is that correct?  In that case, the curtain incident, that being in Minot?

A. Yes.

Q. Okay.  And in that case he was found not guilty of the GSI and the penetration and guilty of the misdemeanor sexual contact, correct?

A. Yes.

Q. Well, you’re fam—you said it’s important to be familiar with the nature of the events, that’s why I’m asking you?

A. Yes, he was convicted of a lesser—he was convicted of a lesser charge than what he was charged out.

Q. Doctor, we don’t have evidence in his records supporting raping under circumstances with high likelihood of being caught raping under circumstances likely to be caught?

A. If you define rape as invoro—involving some sort of penetration.  No.

Q, Well, how is rape defined in respect to NOS Nonconsent?

A. That would be—go back to predatory sexual contact.

Q. Can you show me where it is?

A. It’s a hands-on offense.

Q. That’s the definition?  Rape is hands-on offense.  That’s the criteria under NOS Nonconsent?

A. No.

Q. Okay.  I didn’t think it was.  Now, various, or I should say having con-commitment cooperative sexual partners.  What does that mean?

A. It means you’re very busy sexually.

Q. Okay.  Don’t have evidence of that here, do we?

A. There—there are allegations in the record that might support that, but they’re not—haven’t been confirmed, so—no.

Q. Nothing unusual for an adolescent male, wouldn’t that be true, in terms of being very busy sexually?

A. Depending on what you’re doing, I suppose.  No.

Q. Now, various types of victims, this is number eight from Dr. Doren, various types of victims and purely sex offenses?

A. Right.

Q. Various, I suppose that’s also subject to definition?

A. Yes.

Q. Okay.  How is that met here?

A. I believe that means that there’s a wide range of target types.

Q. And there’s not a wide range of target types here, is there?

A. No.

Q. And the last one, the rape kit, what is a rape kit?  How is that described by Dr. Doren?

A. That’s a—a typically something that a serial rapist would have.  Basically, a collection of items that are useful in performing a rape, such as duct tape or in subduing an individual for purposes of sexual contact.  May include items that they have from previous victims.  That sort of thing.

Q. And where is the evidence of that in this case?

A. There is none.

Q. So it doesn’t look like even if this was a valid and accepted diagnosis that he even fits the criteria as established by one of the, as you acknowledged, the leading experts in this subject matter, isn’t that true?  Yes or no?

A. Not—not with Dr. Doren’s list, no.

Q. North Dakota has relied upon him as an expert for many years in consulting with these types of cases.  Correct?

A. Yes, they have.

[¶25] Even with respect to the “features” that Dr. Lisota had added to the diagnosis, he acknowledged that J.T.N.’s records did not match the criteria set out in the diagnostic manual.

Q. Okay.  Now with your two new, I won’t say diagnosis, or I should say perhaps references to [J.T.N.’s] exhibitionism, we have the criteria for that in the DSM-IV.  Correct?

A. Correct.

Q. And what are the criteria?

A. I’ll look them up for you.

Q. How about if I—I’ve got it, just to speed things up is it okay if I tell you what they are?

A. Sure.

Q. Okay.  Now, over a period of at least six months, there’s recurrent and intense sexual arousing fantasies, sexual urges or behaviors involving exposure of ones genitals to an unsuspecting stranger.  Where is the evidence for that?

A. Historical and I believe during the review period.

Q. I know, you keep saying historical.  I want you to point to it.  Can you tell me that?  As you reviewed these records to base your conclusion and opinion, that’s what I’m asking, where is it?  There is no discussion of it in the progress notes, or the group or treatment notes, is there?

A. No.

Q. Are you basing that upon the one allegation that he exposed himself here in July?

A. No.  Okay, if we look at Dr. Hertler’s evaluation.

Q. And when was the performed?

A. February of ‘04.  And the—

Q. What does he say in that evaluation?  What are you basing your opinion on?  There’s intense sexual arousing fantasies, intense fantasies in this area?

A. That’s what Dr. Hertler’s indicating.

Q. Okay?

A. Based on [J.T.N.’s] sexual history questionnaire.

Q. And that was in 2004, right?

A. Yes.

Q. Well, why in the world would the evaluator from the State Hospital, in 2005, completely miss that and not diagnose it?

A. Unknown.  I—

Q. And in addition, I’m sorry, I don’t mean to cut you off?

A. That’s fine.  In terms of civil commitment, exhibitionism, fetishism are not really relevant unless we are talking about the individual having multiple paraphilia.

Q. And also, the question before the Court today is now, present day.  It’s not six years ago?

A. Right.

Q. Okay, and again it’s that the person has acted on these sexual urges.  That’s the second one?

A. Yes.

Q. And the alleged exposing incident that you have referred to, or vale [sic] referral to in your testimony.  That occurred in the residential room that was assigned to [J.T.N.] at the State Hospital.  Correct?

A. Correct.

Q. And that happened, allegedly, at approximately midnight, when a staff member was making rounds, checking on the residents to see if they were still breathing?

A. Correct.

Q. Okay, and there were no locks on the doors to the resident’s rooms.  Correct?

A. I don’t believe so.

[¶26] On the “feature” of frotteurism, although Dr. Lisota had one recent example of touching, it had no sexual content:

Q. Okay.  Frotteurism or frotteurism, now the DSM also has criteria for that.  Correct?

A. Yes.

Q. And what exactly is that to paraphilia?

A. Deriving sexual pleasure from contact with others.  Typically in—typically where this occurs is in public places, in crowds, brushing up against people.  That sort of thing.

Q. Unsuspecting, nonconsenting persons.  Correct?

A. Right.

Q. Okay.  And the person has acted on those urges?

A. Right.

Q. And you have an allegation that [J.T.N.] touched a leg of a female staff member.  Correct?

A. I think it was a male staff member, but yes.

Q. And what evidence was there that that was for the sexual arousal?

A. There is no evidence that [J.T.N.] was sexually aroused at the time.

[¶27] Dr. Lisota testified that “Axis I disorders typically do wax and wane, especially given [J.T.N.’s] age and the time that he’s been civilly committed.”  Yet, his diagnosis and the minimal “support” for his diagnosis was entirely backward looking.  Commitment under N.D.C.C. ch. 25-03.3 is based upon a 
prediction
 that a person is 
likely
 to offend.  Continued commitment as a sexually dangerous individual under N.D.C.C. ch. 25-03.3 is based upon the present sexual dangerousness of the committed person.  When that commitment is reliant entirely upon the credibility of a witness whose program is dependent upon the continued confinement of individuals, we must exercise our “modified clearly erroneous” standard of review.  Dr. Lisota’s own testimony undermines his credibility, and I believe that the State has failed in its burden of proof to show that J.T.N. remains a sexually dangerous individual.

[¶28] Carol Ronning Kapsner