2012 ND 133

**In the Matter of Larry Gene RUBEY**

**Ladd R. Erickson, State's Attorney, Petitioner and Appellee,**

v.

**Larry Gene Rubey, Respondent and Appellant.**

**No. 20110322.**

Supreme Court of North Dakota.

July 12, 2012.

Ladd R. Erickson (on brief), State's Attorney, Washburn, N.D., for petitioner and appellee.

Gregory I. Runge (on brief), Bismarck, N.D., for respondent and appellant.

SANDSTROM, Justice.

[¶ 1] Larry Rubey appeals from a district court order denying his petition for discharge from civil commitment as a sexually dangerous individual under N.D.C.C. ch. 25–03.3. We affirm, concluding the court's order is not based on an erroneous view of the law and the court did not err in concluding the State established by clear and convincing evidence that Rubey remained a sexually dangerous individual.

I

[¶ 2] In 1988, Rubey was convicted of gross sexual imposition and received a three-year deferred imposition of sentence. In 1999, Rubey was convicted of gross sexual imposition and two counts of corruption or solicitation of a minor. Prior to Rubey's release from the twelve-year prison sentence, the State petitioned the court to commit him as a sexually dangerous individual. On August 5, 2010, after Rubey's criminal convictions of crimes involving horrific abuse against children, the "district court found by clear and convincing evidence that Rubey [was] a sexually dangerous individual and committed him to the care, custody, and control of the executive director of the Department of Human Services under N.D.C.C. ch. 25–03.3." *In re Rubey*, 2011 ND 165, ¶ 3, 801 N.W.2d 702 (affirming order).

[¶ 3] On June 14, 2011, a representative of the North Dakota State Hospital advised Rubey of his right to file an annual petition to the district court for discharge from civil commitment, and Rubey requested a discharge hearing the next day.

[¶ 4] On September 30, 2011, the district court held a hearing on Rubey's discharge petition, and Rubey and the State each presented evidence through their own expert examiner. Prior to the discharge hearing, the court received written evaluations from Robert Lisota, Ph.D., the State's expert examiner, and Stacey Benson, Psy.D., Rubey's independent qualified expert examiner. At the hearing, the two experts agreed Rubey met two of the three requirements classifying him as a sexually dangerous individual under N.D.C.C. § 25–03.3–13. The experts agreed Rubey, having been convicted of offenses involving sexual assault, had previously engaged in sexually predatory conduct and had a congenital or acquired condition manifested by a sexual disorder, a personality disorder, or other mental disorder or dysfunction because he had been diagnosed with "pedophilia, sexually attracted to females, non-exclusive type." The State's expert also diagnosed Rubey with "personality disorder not otherwise specified, antisocial and narcissistic traits." The two experts disagreed, however, on whether Rubey was likely to engage in further acts of sexually predatory conduct and whether he had serious difficulty controlling his behavior.

[¶ 5] On October 7, 2011, after reviewing both experts' evaluations of Rubey and weighing their testimony at the discharge hearing, the district court found the State established by clear and convincing evidence that Rubey was likely to re-offend and that he had serious difficulty controlling his behavior. As a result, the court ordered him to remain committed as a sexually dangerous individual.

[¶ 6] The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. § 25–03.3–02. Rubey timely appealed from the order under N.D.C.C. § 25–03.3–19. We have jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. § 25–03.3–19.

## II

[¶ 7] Rubey argues the district court erred in concluding the State proved by clear and convincing evidence that he remained a sexually dangerous individual under N.D.C.C. ch. 25–03.3.

[¶ 8] Our review of a civilly-committed, sexually dangerous individual is well-established:

We review civil commitments of sexually dangerous individuals under a modified clearly erroneous standard in which we will affirm a district court's order "unless it is induced by an erroneous view of the law or we are firmly convinced [the order] is not supported by clear and convincing evidence."

*In re Rubey,* 2011 ND 165, ¶ 5, 801 N.W.2d 702 (quoting *In re T.O.,* 2009 ND 209, ¶ 8, 776 N.W.2d 47). Under N.D.C.C. § 25–03.3–13, the burden is on the State to prove by clear and convincing evidence the respondent is a sexually dangerous individual. A "sexually dangerous individual" means:

an individual who is shown to have engaged in sexually predatory conduct and who has a congenital or acquired condition that is manifested by a sexual disorder, a personality disorder, or other mental disorder or dysfunction that makes that individual likely to engage in further acts of sexually predatory conduct which constitute a danger to the physical or mental health or safety of others.

N.D.C.C. § 25–03.3–01(8). " 'The phrase "likely to engage in further acts of sexually predatory conduct" means the individual's propensity towards sexual violence is of such a degree as to pose a threat to others.' " *In re Rubey,* 2011 ND 165, ¶ 5, 801 N.W.2d 702 (quoting *Matter of E.W.F.,* 2008 ND 130, ¶ 10, 751 N.W.2d 686). "Substantive due process requires proof that the individual facing commitment has serious difficulty controlling his behavior." *Id.* (citing *Matter of E.W.F.,* at ¶ 10; *Kansas v. Crane,* 534 U.S. 407, 413, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002)).

[¶ 9] We have opined on what constitutes sufficient findings for civil commitment decisions:

"Conclusory, general findings do not comply with N.D.R.Civ.P. 52(a), and a finding of fact that merely states a party has failed in [or has sustained] its burden of proof is inadequate under the rule. The court must specifically state the facts upon which its ultimate conclusion is based.... The purpose of the rule is to provide the appellate court with an understanding of the factual issues and the basis of the district court's decision. Because this Court defers to a district court's choice between two permissible views of the evidence and the district court decides issues of credibility, detailed findings are particularly important when there is conflicting or disputed evidence."

*Id.* at ¶ 6 (quoting *In re R.A.S.,* 2008 ND 185, ¶ 8, 756 N.W.2d 771) (emphasis omitted). " 'Detailed findings, including credibility determinations and references to evidence the court relied on in making its decision, inform the committed individual and this Court of the evidentiary basis for the court's decision.' " *Id.* (quoting *In re R.A.S.,* at ¶ 9).

[¶ 10] Rubey concedes he meets two of the three requirements classifying him as a sexually dangerous individual under N.D.C.C. § 25–03.3–13. He argues, however, the district court erred in concluding the State proved by clear and convincing evidence that he was likely to engage in future acts of sexually predatory conduct and that he had serious difficulty controlling his behavior.

[¶ 11] Rubey argues the district court ignored the results of his expert's Minnesota Sexual Offender Screening Tool–Revised ("MnSOST–R") assessment of him, which differed from the results of the State's expert's assessment. Rubey argues his expert's assessment showed a lesser likelihood of his engaging in future sexually predatory conduct, especially when he reached the age of sixty, which, at the time, was only months away. Rubey argues his expert concluded his test scores put him in a category of a "typical incarcerated offender," which meant he was a typical offender, but not a dangerous offender. *See Crane*, 534 U.S. at 413, 122 S.Ct. 867 (distinguishing a dangerous sexual offender "whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case").

[¶ 12] Rubey also argues the district court erred in concluding he had serious difficulty controlling his behavior. He argues the State did not present any evidence showing he had serious difficulty controlling his behavior, nor did it provide any records from the state penitentiary or the state hospital evidencing problems with his ability to control his behavior.

[¶ 13] The State responds its expert diagnosed Rubey with an additional acquired condition that the expert originally was unable to diagnose because of Rubey's lack of cooperation. The State's expert found Rubey suffered from antisocial and narcissistic traits, adding to his original diagnosis of pedophilia, sexually attracted to females, non-exclusive type. The State also argues Rubey failed to remain in sex offender treatment, evidenced by his quitting treatment and by the resulting termination of his treatment. The State further argues that when its expert asked Rubey what he believed the likelihood would be of

his re-offending, on a scale from zero to ten, Rubey replied "zero." The State's expert testified Rubey lacked insight into his condition, because all offenders pose at least some risk of re-offending.

[¶ 14] After reviewing both experts' reports and hearing their testimony, the district court found:

The experts agree that Rubey meets two of the three prongs set out in N.D.C.C. 25–03.3–13—(1) that Rubey previously engaged in sexually predatory conduct in that he had been convicted of offenses involving sexual assault and (2) that Rubey has a congenital or acquired condition manifested by a sexual disorder, a personality disorder, or other mental disorder or dysfunction, specifically that he has had a diagnosis of Pedophelia, Sexually Attracted to Females, Nonexclusive Type. Dr. Lisota added a further diagnosis of Personality Disorder NOS, Antisocial, Narcissistic. Dr. Lisota testified that he had been unable to reach the latter diagnosis originally because he had been unable to interview Rubey. Dr. Benson testified that she did not have sufficient evidence for such a diagnosis.

The experts disagreed on prong three of N.D.C.C. 25–03.3–13—whether Rubey is likely to engage in further acts of sexually predatory conduct. The experts also disagree on a fourth factor required by appellate courts but not found in the statute, that being whether Rubey has serious difficulty in controlling his behavior. *See, In Re: G.R.H.*, 2011 [ND] 21, 793 N.W.2d 460.

Dr. Lisota[, the State's expert,] based his opinion regarding whether Rubey is likely to re-offend on the results of actuarial assessments including the Static–99R, the MnSOST–R, and the PCL–R. He further based his opinion on Rubey's history of illegal behavior, lack of re-

morse, impulsiveness, and the added diagnosis of personality disorder. He based his opinion regarding Rubey's difficulty in controlling his behavior in large part on Rubey's failure to progress in treatment. Much discussion was had at the hearing as to whether Rubey quit or was terminated from treatment at the state penitentiary. It appears he was terminated because he quit. Dr. Lisota's opinion is that the lack of progress in or completion of treatment would make relapse prevention more difficult. Dr. Lisota also gave weight in both his conclusions on likelihood of re-offending and lack of control to the fact that Rubey stated his likelihood of re-offending was zero. Dr. Lisota opined that this statement shows a lack of insight in that all sex offenders have at least some risk of re-offense and that Rubey's lack of insight, coupled with his failure to complete treatment, contributed to his likelihood of re-offending. Dr. Lisota stated that the latter opinion is based on the fact that pedophelia cannot be cured, but that an offender can learn to curb impulses through successive stages of treatment. Rubey is still in the first stage of treatment and has made little progress.

Dr. Lisota's report included notes from the treatment Rubey is in currently at the state hospital. While individual passages may support Rubey's position that he is progressing in treatment, a reading of all the notes together supports Dr. Lisota's conclusion that Rubey is resistant, in denial, and doing "just enough to get by."

Finally, Dr. Lisota noted that Rubey began to offend in his early thirties and has not been able to control his behavior for significant time periods when not incarcerated.

Dr. Benson[, Rubey's expert,] based her opinions entirely on the actuarial instruments. She did not find a diagnosis of personality disorder, which diagnosis Dr. Lisota found to be a significant factor both as to risk of re-offending and difficulty in controlling behavior. Dr. Benson did not do a PCL–R, but agreed with Dr. Lisota's scoring and interpretation of the score.

The Court finds Dr. Lisota's opinions more persuasive than Dr. Benson's because he looked at and applied more than just the actuarial instruments in forming his opinions and drawing his conclusions.

The Court finds that the State has established by clear and convincing evidence that Rubey is likely to re-offend and that he has serious difficulty in controlling his behavior, and that therefore he remains a sexually dangerous individual.

[¶ 15] A review of the district court order shows it based its decision to deny Rubey's motion for discharge on specific findings after it found the State's expert to be "more persuasive" than Rubey's. "This Court does not weigh conflicting evidence, nor does it judge the credibility of the witnesses." *State v. Klindtworth*, 2005 ND 18, ¶ 8, 691 N.W.2d 284. The court found Rubey suffered from antisocial and narcissistic traits, an additional acquired condition the State's expert diagnosed during his evaluation of Rubey but was unable to diagnose at Rubey's initial civil commitment hearing because of Rubey's lack of cooperation. The expert's diagnosis of the acquired condition added to Rubey's initial diagnosis of pedophilia, sexually attracted to females, nonexclusive type. The court also found Rubey failed to progress in treatment and was terminated from the program because he first quit the program. As further evidence of Rubey's lack of progress in treatment, the court found Rubey lacked

insight into his condition, because he told the State's expert that the likelihood of his re-offending was "zero" on a scale of zero to ten. The State's expert testified that all offenders have at least some risk of re-offending. The court also found Rubey failed to control his behavior for significant periods of time while he was not incarcerated.

[¶ 16] The district court's finding that Rubey was likely to engage in future acts of sexually predatory conduct and had serious difficulty controlling his behavior is supported by the evidence and is not clearly erroneous. We conclude the court's order is not based on an erroneous view of the law, and we are convinced the court's order is supported by clear and convincing evidence. We therefore conclude the court did not clearly err in finding the State established by clear and convincing evidence that Rubey remains a sexually dangerous individual under N.D.C.C. ch. 25–03.3.

### III

[¶ 17] We affirm the district court order.

[¶ 18] GERALD W. VANDE WALLE, C.J., DANIEL J. CROTHERS, and MARY MUEHLEN MARING, JJ., concur.

KAPSNER, Justice, dissenting.

[¶ 19] I respectfully dissent.

[¶ 20] The majority recites the opinion of the district court. The sum and substance of that opinion is that Rubey displays a "lack of insight" together with a "failure to complete treatment."

[¶ 21] When one examines the actual testimony offered by the State's expert witness, the testimony is simply insufficient to meet the criteria to continue to deprive Rubey of his freedom under the statute for civil commitment as a sexually dangerous individual. Rubey must be shown to meet the criteria now, not when he committed the crimes for which he has been punished under the criminal law.

[¶ 22] We are required to review the evidence in support of commitment under a modified clearly erroneous standard to determine whether the order is supported by clear and convincing evidence. *Matter of Vantreece*, 2009 ND 152, ¶ 4, 771 N.W.2d 585. Based on the evidence, and lack thereof, offered by the State, I am firmly convinced the district court's order is not supported by clear and convincing evidence. We have previously outlined the burden on the State under the statute:

> In [*In re*] *Vantreece* [2008 ND 197, 758 N.W.2d 909], we said commitment as a "sexually dangerous individual" is authorized under N.D.C.C. ch. 25–03.3, if the State clearly and convincingly establishes the individual:
>
> > " '[1] engaged in sexually predatory conduct ... [2] has a congenital or acquired condition that is manifested by a sexual disorder, a personality disorder, or other mental disorder or dysfunction that [3] makes that individual likely to engage in further acts of sexually predatory conduct which constitute a danger to the physical or mental health or safety of others.'
> >
> > "N.D.C.C. § 25–03.3–01(8). In addition to the three requirements of the statute, there must also be proof the committed individual has serious difficulty controlling his behavior to satisfy substantive due process requirements. *[In the Matter of] E.W.F.*, 2008 ND 130, ¶ 10, 751 N.W.2d 686 (citing *Kansas v. Crane*, 534 U.S. 407, 413, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002))."
>
> 2008 ND 197, ¶ 1, 758 N.W.2d 909, 2008 WL 5003448 (quoting *Matter of R.A.S.*,

2008 ND 185, ¶ 6, 756 N.W.2d 771). The substantive due process requirement of *Crane* is not a "fourth prong" of N.D.C.C. § 25–03.3–01(8); rather, the constitutional requirement is part of the definition of a "sexually dangerous individual." *Matter of R.A.S.*, 2009 ND 101, ¶ 15, 766 N.W.2d 712. Thus, "we have construed the definition of a sexually dangerous individual to require that there must be a nexus between the [individual's] disorder and dangerousness, proof of which encompasses evidence showing the individual has serious difficulty in controlling his behavior, which suffices to distinguish a sexually dangerous individual from other dangerous persons." [*In re*] *G.R.H.*, 2008 ND 222, ¶ 7, 758 N.W.2d 719.

*Id.* at ¶ 6.

[¶ 23] As is typical in these cases, Rubey is not contesting the first two "prongs" to establish commitment. What is at issue is whether it has been established that he is likely to engage in further acts of sexually predatory conduct and whether he can be shown to pass the *Crane* threshold. Neither is shown by clear and convincing evidence in this record.

[¶ 24] Usually in cases like this the person's inability to control behavior is demonstrated by rule-breaking, though not necessarily of a sexual nature. *See, e.g.*, *Interest of G.L.D.*, 2011 ND 52, ¶ 7, 795 N.W.2d 346 (committee facing charges for assaulting State Hospital staff); *Matter of A.M.*, 2010 ND 163, ¶ 5, 787 N.W.2d 752 (stalking female staff); *Matter of E.W.F.*, 2008 ND 130, ¶ 5, 751 N.W.2d 686 (stalking female member of staff). As the majority's quotation of the district court's opinion indicates, the district court did not cite to any specific current or recent conduct of Rubey to demonstrate that he has trouble controlling his behavior. There is no such conduct in the reports of his time at the State Hospital. When the State's expert, Dr. Robert Lisota, was asked to identify what indicated Rubey was likely to re-offend, Dr. Lisota responded with Rubey's criminal history and the fact that Rubey quit Intensive Sex Offender treatment in the penitentiary in 2008. "[T]he only major infraction he had in prison was non-compliance with treatment." It was the penitentiary program from which Rubey was "terminated" because he quit; there is nothing in the record indicating he has quit treatment at the State Hospital. Dr. Lisota acknowledged that Rubey continues to participate:

THE WITNESS: That would be indicated in the controlled environment by his inadequate treatment participation today.

Q. (MR. RUNGE CONTINUING) Well, let's talk about the inadequate participation for a minute. What has he not done that he's supposed to be doing? He's participated, maybe not as much as other participants, but he has participated; correct?

A. He has participated.

Q. Okay. So what has he not done? I mean I've looked at all the documents that you've listed from Pages 14, Appendix 2, all the way to 24. Nowhere is there any serious write-up of him having problems or not participating in a general manner. He is there. He's on time. He does his work. What's the problem?

A. Well, the problem isn't with him attending treatment, it's how he's doing treatment.

Q. Okay. Well, give me an example of how he's doing treatment that is not correct.

A. There are multiple notes that indicate he is defensive.

[¶ 25] The notes show Rubey's lack of understanding of the harm his crimes had

done to his victims. But nowhere in the notes submitted in the evidence is there any indication of current or recent harmful behavior directed at another person or property or other rule-breaking.

[¶ 26] Not only is there no clear and convincing *behavioral* evidence, there is no clear and convincing *actuarial* evidence to meet the *Crane* test. Dr. Lisota administered a Psychopathy Checklist–Revised test to Rubey. This test does not establish that Rubey is dangerous. He received a score of 23, less than that indicative of paraphilia by psychopathic interaction:

Q. Do you come up with a definitive or some sort of conclusion?

A. Yes, the PCL–R scores on a range from 0 to 40.

Q. And what is it trying to get at?

A. How psychopathic the individual is.

Q. Okay. What happened when you ran the test in this case?

A. When I completed the test, I believe I came up with a total score of 23.

Q. And what does that mean in terms—that's about the mid-point roughly?

A. It is. It's indicative of some psychopathic traits. Not to a level—30 is the cut point, established cut point for deeming an individual a psychopath. If we're looking at a paraphilia by psychopathy interaction, 25 is the general accepted cut-off for that.

[¶ 27] Rubey was given the other standard actuarial tests; they do not support a high likelihood of risk, according to Dr. Lisota's testimony:

Q. Okay. Hang on. Hang on. Now, let's go back, I want to talk about the Static–99. What is the Static–99 for purposes of edification?

A. The Static–99 and Static–99R as well as the MnSOST–R, they're all actuarial instruments in which the individual is compared across a variety of factors to the developmental sample of the instrument in order to provide some estimate of his risk for re-offen[s]e.

Q. And this is a well-accepted risk assessment?

A. Yes.

Q. He fell into the low—or excuse me. Moderate range on the Static–99; right? Or is it low-moderate or moderate-low?

A. Yeah, I've got moderate-low.

Q. Okay. So you have three ranges; right? You have low, moderate, and high?

A. Low, moderate and high.

Q. Okay. Hang on. Just answer the question yes or no.

A. Yes.

Q. Low, moderate, high; right? Okay. So you scored him on the low-moderate side; right?

A. Correct.

Q. Okay. And you didn't score him in the moderate; you didn't score him in the high; you scored him in the low?

A. On the Static, yes.

Q. And his associated percentage was 19.7; right?

A. That's correct.

Q. And this is the Static now. And his score was a two?

A. Correct.

Q. What is the score received by a typical offender in these cases?

A. Two.

Q. In your report now on the bottom after the—in the paragraph you say that, "Mr. Rubey is at least as likely as the 'typical' sex offender in the Static–99 sample to be reconvicted of a sexual predatory crime." And is that a correct statement?

A. Yes.

Q. Is that my correct observation?

A. Yes.

Q. Now, he turns 60 in less than a year?

A. That's correct.

Q. What does that do?

A. Then his Static score will drop by an additional two points.

Q. Which would be what? Zero; right?

A. Correct.

Q. And what's the significance with a zero?

A. Then you're below—you're less likely than the average sex offender to re-offend.

[¶ 28] Rubey was approaching his sixtieth birthday at the time of this hearing. In addition, Rubey had been diagnosed with multiple sclerosis. Neither his age nor his physical condition appears to have been considered.

[¶ 29] We are not permitted to continue to incarcerate Rubey solely for his past criminal offenses. Being "defensive" while participating in treatment at the State Hospital does not rise to the level of clear and convincing evidence that Rubey is likely to engage in further acts of sexually predatory conduct which constitute a danger to the physical or mental health or safety of others. We have reiterated on prior occasions that the *Crane* requirement is "necessary to prevent civil commitment from becoming a mechanism for retribution or general deterrence, which are functions of criminal law and not civil commitment." *Matter of G.R.H.*, 2006 ND 56, ¶ 12, 711 N.W.2d 587 (majority citing *Kansas v. Crane*, 534 U.S. 407, 412, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002)). *See also Matter of R.A.S.*, 2008 ND 185, ¶¶ 12–13, 756 N.W.2d 771. I dissent because Rubey appears to be committed solely on the basis of his lack of appreciation of the harm he did in the past rather than his meeting the statutory criteria of N.D.C.C. ch. 25–03.3.

[¶ 30] CAROL RONNING KAPSNER