2015 ND 206

In the Interest of Nelson
G. WHITETAIL, Sr.

Jessica J. Binder, State's Attorney,
Petitioner and Appellee,

v.

Nelson G. Whitetail, Sr., Respondent
and Appellant.

No. 20140455.

Supreme Court of North Dakota.

Aug. 25, 2015.

Jessica J. Binder, State's Attorney, Stanton, ND, for petitioner and appellee.

Kent M. Morrow, Bismarck, ND, for respondent and appellant.

CROTHERS, Justice.

[¶ 1] Nelson Whitetail, Sr., appeals from an order denying his petition for discharge as a sexually dangerous individual. Whitetail argues the district court erred by finding clear and convincing evidence exists that he is likely to engage in further acts of sexually predatory conduct and by finding it lacked authority to order his release subject to supervision. We affirm.

I

[¶ 2] Whitetail was committed as a sexually dangerous individual by court order

on December 21, 2012. Whitetail appealed the commitment order, which we affirmed. *In re Whitetail,* 2013 ND 143, 835 N.W.2d 827. On February 6, 2014, Whitetail filed a petition for discharge under N.D.C.C. 25–03.3–18. An evaluation was completed and submitted by Dr. Robert D. Lisota, a psychologist at the North Dakota State Hospital. Dr. Lisota concluded Whitetail is likely to engage in further acts of sexually predatory conduct. An independent evaluation was completed and submitted by another psychologist, Dr. Robert G. Riedel. Dr. Riedel concluded Whitetail is not likely to engage in further acts of sexually predatory conduct. At the September 15, 2014 hearing, the court heard testimony from Dr. Lisota, Dr. Riedel and Whitetail. The district court found Whitetail continues to be a sexually dangerous individual under N.D.C.C. ch. 25–03.3. The district court denied Whitetail's petition for discharge and ordered continued commitment. Whitetail appeals.

## II

■■■ [¶ 3] "A 'modified clearly erroneous' standard of review is employed by this Court when reviewing the civil commitment of sexually dangerous individuals under N.D.C.C. ch. 25–03.3." *In re Johnson,* 2015 ND 71, ¶ 4, 861 N.W.2d 484 (citing *Matter of J.T.N.,* 2011 ND 231, ¶ 6, 807 N.W.2d 570).

> "We will affirm a trial court's order denying a petition for discharge unless it is induced by an erroneous view of the law or we are firmly convinced it is not supported by clear and convincing evidence. In reviewing the trial court's order, we give great deference to the court's credibility determinations of expert witnesses and the weight to be given their testimony. The trial court is the best credibility evaluator in cases of conflicting testimony and we will not

second-guess the court's credibility determinations."

*In re Wolff,* 2011 ND 76, ¶ 5, 796 N.W.2d 644 (citations and quotation marks omitted).

## III

■■■ [¶ 4] "Commitment as a sexually dangerous person is governed by N.D.C.C. ch. 25–03.3. Involuntary commitment of an individual is authorized when the State can establish by clear and convincing evidence that the individual is a sexually dangerous individual. N.D.C.C. 25–03.3–13." *In re J.M.,* 2006 ND 96, ¶ 9, 713 N.W.2d 518. Under N.D.C.C. 25–03.3–01(8), a sexually dangerous individual is one who:

> "[I]s shown to have engaged in sexually predatory conduct and who has a congenital or acquired condition that is manifested by a sexual disorder, a personality disorder, or other mental disorder or dysfunction that makes that individual likely to engage in further acts of sexually predatory conduct which constitute a danger to the physical or mental health or safety of others."

Commitment of an individual as sexually dangerous requires the State to prove:

> "(1) the individual has engaged in sexually predatory conduct; (2) the individual has a congenital or acquired condition that is manifested by a sexual disorder, a personality disorder, or other mental disorder or dysfunction; and (3) the disorder makes the individual likely to engage in further acts of sexually predatory conduct which constitute a danger to the physical or mental health or safety of others."

*In re G.R.H.,* 2006 ND 56, ¶ 6, 711 N.W.2d 587.

■■■ [¶ 5] Whitetail argues the district court erred by concluding clear and convincing evidence exists that Whitetail is likely to engage in further acts of sexually

predatory conduct. "The phrase 'likely to engage in further acts of sexually predatory conduct' means the individual's propensity towards sexual violence is of such a degree as to pose a threat to others." *In re Rubey*, 2012 ND 133, ¶ 8, 818 N.W.2d 731 (citations and quotation marks omitted). "Substantive due process requires proof that the individual facing commitment has serious difficulty controlling his behavior." *Id.*

[¶ 6] Whitetail argues whether he is likely to engage in further acts of sexually predatory conduct must focus on his future risk and not his past failures. Whitetail notes his score on the Static–99R is two, representing a moderate-low risk of reoffending and his score on the STABLE 2007 is moderate risk for reoffending. However, we have explained, "The importance of independent judicial decision-making means the judge, rather than the test scores or the psychologists who create them, is the ultimate decision-maker." *In re Hehn*, 2008 ND 36, ¶ 21, 745 N.W.2d 631. Actuarial tests are only one factor used to determine whether an individual is likely to engage in further acts of sexually predatory nature. *See In re J.T.N.*, 2011 ND 231, ¶ 18, 807 N.W.2d 570. "Under the third prong of the commitment analysis, evaluating psychologists can 'use the fullness of their education, experience and resources available to them in order to determine if an individual poses a threat to society.'" *In re Voisine*, 2010 ND 17, ¶ 14, 777 N.W.2d 908 (quoting *In re M.B.K.*, 2002 ND 25, ¶ 18, 639 N.W.2d 473). "This standard applies equally to experts and courts alike, and its inclusive nature leads us to conclude that all relevant conduct should be considered under this prong of the analysis." *Id.*

[¶ 7] Here, the experts differed on whether Whitetail is likely to engage in further acts of sexually predatory conduct.

Dr. Riedel's report focused on Whitetail's actuarial numbers. Dr. Riedel testified based upon Whitetail's actuarial numbers and his current medical condition, "[Whitetail] has a minuscule chance of reoffending." Dr. Lisota, explaining Whitetail's relevant conduct, reported:

"Mr. [Whitetail's] sexual offending has been persistent across time, with re-offenses despite previous sanctions including prison time and 'successful' completion of intensive sex offender treatment in prison. The fact that he has been reconvicted for a sexual offense after 'successfully' completing intensive sex offender treatment in DOCR is at the least problematic in that it is indicative that treatment has actually not been successful in [ ] helping him to control his behavior [in] the past. This further reflects a serious, long-standing problem with controlling his impulses and sexual behavior."

. . . .

"It is concluded that a nexus exists linking the Antisocial Personality Disorder with Narcissistic Features to Mr. [Whitetail's] sexual offending in that his pattern of sexually predatory conduct is characterized by predatory offending, impulsivity, deceitfulness, and a lack of remorse for his victims. Given that Mr. [Whitetail] has a history of more than one sexual (or sexually-motivated) offense against under-age females, it is likely that his personality disorder in combination with his paraphilia will lead him to engage in recidivist sexually predatory conduct. However, the behaviors prompted by either diagnosis alone would also likely lead him to engage in sexually predatory conduct."

. . . .

"[The results of the dynamic risk factors relevant to assessing the likelihood of further acts of sexually predatory

conduct] indicate that Mr. [Whitetail] currently poses a *moderate* risk of sexually offensive behavior over the short term."

. . . .

"It is the undersigned's professional opinion that Mr. [Whitetail] does not currently demonstrate 'serious difficulty' controlling his behavior due to his application of treatment principles in a controlled environment. Were he to fall back into old patterns this would likely be problematic, and, most importantly, whether or not Mr. [Whitetail] can maintain his current level of performance in a less restrictive environment remains to be seen."

[¶ 8] In conclusion, Dr. Lisota explained:

"Either disorder alone creates initial reason to believe he will have serious difficulty controlling his behavior and he may be likely to engage in further acts of sexually predatory conduct, particularly in the context of his history of sexually offensive behavior. Mr. [Whitetail] has not yet adequately participated in a course of intensive sex offender treatment that would further mitigate his risk. The results of the dynamic risk factors indicate his risk for future sexual re-offense is moderate over the short term primarily due to his performance in treatment over the review period. I identified no idiosyncratic factors that would mitigate his risk of sexually violent re-offense. It is my professional opinion that Mr. [Whitetail] would likely experience serious difficulty controlling his behavior if released to the community without supervision at this time."

"Given the reasoning detailed above, it may be concluded to a reasonable degree of scientific certainty Mr. [Whitetail] is likely to engage in further acts of sexually predatory conduct by virtue of

mental disorder and personality disorder."

[¶ 9] Whitetail focuses on Dr. Lisota's statement in his report, explaining, "[Whitetail] does not currently display 'serious difficulty' in treatment. . . . It is the undersigned's professional opinion that Mr. [Whitetail] does not currently demonstrate 'serious difficulty' controlling his behavior due to his application of treatment principles in a controlled environment." Whitetail argues Dr. Lisota is not convinced of Whitetail's future risk. However, at the hearing, Dr. Lisota explained, "Until Mr. Whitetail has participated in treatment to an extent that he can successfully manage the symptoms of [his] disorders in a less-restrictive environment, they make him likely to engage in further acts of sexual predatory conduct." Dr. Lisota focused on Whitetail's past behavior and his need to demonstrate an ability to control his behavior in a less restrictive environment before discharge.

[¶ 10] The district court found:

"The Court is persuaded by Dr. Lisota's statements of how Whitetail's diagnosis of pedophilia does not go away and he must learn to control his urges. Whitetail is doing well in treatment, but has not progressed to the stage of being placed in the community or in the less restrictive community placement within treatment to work towards his ability to function in the community safely. The Court finds Dr. Lisota's explanation of relying heavily upon Whitetail[']s prior actions of reoffending after sanctions, treatment, and probation as a strong indicator he is likely to reoffend."

[¶ 11] Whitetail argues the focus on his past behavior, nearly 25 years ago, is wrong and fails to reward him for the steps he has taken to reduce his risk of reoffending. However, the district court relied on other evidence as well in deciding

Whitetail remains a sexually dangerous individual, "and a person's past conduct is certainly a relevant consideration." *Whitetail*, 2013 ND 143, ¶ 14, 835 N.W.2d 827; *see also In re R.A.S.*, 2009 ND 101, ¶ 20, 766 N.W.2d 712.

[¶ 12] Dr. Riedel recommends Whitetail "be released and not committed as SDI but that he be committed to the community with an order to participate in CPC until released by that program." Dr. Riedel "further recommend[s] that the Court consider extended supervision which would lower his chances of recidivism even more tha[n] the currently very low estimates and this would provide him with more direction and support services as well." Whitetail is entitled to be placed in the "least restrictive available treatment facility or program" under N.D.C.C. 25–03.3–13. However, as discussed below, Whitetail has not explained how the State could lawfully exercise supervision over Whitetail after his discharge from civil commitment under N.D.C.C. ch. 25–03.3.

[¶ 13] The district court further found "Dr. Riedel proposes Whitetail will likely not reoffend and yet he recommends Whitetail to continue his treatment in the community and that he be on probation. If Whitetail is not likely to reoffend then why would he need further treatment and supervision in the community as recommended by Dr. Riedel." Moreover, the court noted, "Dr. Riedel offers to the Court Whitetail has an almost non-existent chance to reoffend due to his actuarial numbers, the age or death of his prior victims and his current health conditions.... Dr. Riedel seems to want the Court to see these offenses as explainable by criminal opportunity rather than due to Whitetail's pedophilia or antisocial personality disorder." The district court found, "The Court as it did in the commitment

hearing finds Dr. Riedel's position unconvincing."

[¶ 14] "We give great weight to the court's credibility determinations, and we do not reweigh expert testimony or second-guess credibility determinations made by the trial court in sexually dangerous individual proceedings." *In re Mangelsen*, 2014 ND 31, ¶ 14, 843 N.W.2d 8 (internal citation omitted). "A claim that the district court improperly relied on one expert's opinion over the other challenges the weight of the evidence, not the sufficiency of the evidence. A choice between two permissible views of the weight of the evidence is not clearly erroneous." *In re Thill*, 2014 ND 89, ¶ 17, 845 N.W.2d 330 (citation and quotation marks omitted).

[¶ 15] The district court found Whitetail is likely to engage in further acts of sexually predatory conduct based upon:

"1) his failure at this time to satisfactorily complete his program of treatment; 2) his own admission of not being ready to be released; 3) his lack of support in the community if he were released[;] 4) his past actions of reoffending while on probation, after release from incarceration and after completing treatment; 5) his lack of supervision of any kind as recommended by both experts in this matter[;] 6) his diagnosis of both pedophilia and antisocial personality disorder make the likelihood of reoffending likely if he is to rely on his ability to manage his urges without completion of treatment or community supports as stated as being needed by both experts."

[¶ 16] Based on the evidence presented, the district court did not err by finding Whitetail is likely to engage in further acts of sexually predatory conduct and Whitetail has serious difficulty controlling his behavior.

## IV

[¶ 17] Whitetail argues the district court erred by finding it lacked authority to order his release subject to supervision. He argues under N.D.C.C. 25–03.3–17(5) the district court has the authority over whether someone can be released and under what conditions. Whitetail reads that provision out of context. Section 25–03.3–17(5), N.D.C.C., provides, "The executive director may only discharge a sexually dangerous individual from commitment pursuant to a court order." Whitetail argues section 25–03.3–17(5) limits the authority of the executive director and acknowledges the authority of the district court. The district court found, "The argument that the Court can place Whitetail on extended supervision is not supported by law."

[¶ 18] Commitment of a sexually dangerous person is governed by N.D.C.C. ch. 25–03.3. "The interpretation of N.D.C.C. ch. 25–03.3 is a question of law, which is fully reviewable on appeal." *In re G.R.H.*, 2006 ND 56, ¶ 15, 711 N.W.2d 587. Under N.D.C.C. 25–03.3–13:

> "If the respondent is found to be a sexually dangerous individual, the court shall commit the respondent to the care, custody, and control of the executive director. The executive director shall place the respondent in an appropriate facility or program at which treatment is available. The appropriate treatment facility or program must be the least restrictive available treatment facility or program necessary to achieve the purposes of this chapter. The executive director may not be required to create a less restrictive treatment facility or treatment program specifically for the respondent or committed individual."

[¶ 19] Release from the care, custody and control of the executive director may only be granted by court order. *See*

N.D.C.C. 25–03.3–17(5) ("The executive director may only discharge a sexually dangerous individual from commitment pursuant to a court order.").

> "Following commitment of a sexually dangerous individual, the executive director may conduct a risk management assessment of the committed individual for the purpose of determining whether the individual may be treated safely in the community on an outpatient basis. The executive director may place a committed individual in the community for treatment on an outpatient basis only pursuant to a court order. The executive director may petition the court at any time for community placement."

N.D.C.C. 25–03.3–24(1). Violation of the court order for community placement and its conditions is a class C felony. N.D.C.C. 25–03.3–24(2).

> "The court's order of community placement must contain appropriate restrictions and requirements for the committed individual, including:
>
> a. Participation and compliance with a specific course of treatment;
>
> b. Submission to electronic monitoring and any other appropriate supervision;
>
> c. Prohibition of the individual changing place of residency or leaving the state without prior authorization of the court;
>
> d. Establishment of safety zones, and compliance by the committed individual with those safety zones;
>
> e. Requirement that the committed individual notify the court within twenty-four hours of any change in the individual's status that affects proper treatment or supervision;
>
> f. Contact with victims is prohibited independent of a supervised treatment plan; and

g. "Any other restriction or requirement deemed necessary by the court to assure public safety and proper treatment of the committed individual."

N.D.C.C. 25–03.3–24(1).

[¶ 20] Whitetail argues the district court erred when it concluded it had no legal authority to place Whitetail on extended supervision and order conditions as terms of his release from commitment. At the hearing, Whitetail offered an exhibit outlining "community civil commitment conditions" from the North Dakota Department of Corrections and Rehabilitation Field Services Division. Whitetail argues the district court erred, after hearing testimony from both psychologists explaining Whitetail would benefit from supervised release, by concluding the court could not order supervision upon release.

[¶ 21] Chapter 25–03.3 authorizes the district court to civilly commit sexually dangerous individuals to the care, custody and control of the executive director. The executive director has the authority to appropriately place the respondent in a facility or program. The respondent is bound to the care, custody and control of the executive director until the district court orders discharge. The executive director may petition the court for community placement, and place a committed individual in the community for treatment on an outpatient basis but only pursuant to a court order. Section 25–03.3–13, N.D.C.C., requires that the individual be placed in an appropriate treatment facility or program which "must be the least restrictive available treatment facility or program necessary to achieve the purposes of this chapter." "The determination of the least restrictive treatment available is initially made by the executive director of the Department, but the individual may challenge his continued commitment if the statutory requirements are being violated." *In re Whitetail*, 2013 ND 143, ¶ 6, 835 N.W.2d 827. Here, the executive director did not petition the court for community placement. Dr. Lisota testified Whitetail was not ready for community placement and he would likely recommend Whitetail for community placement next review period.

[¶ 22] Section 25–03.3–24(1), N.D.C.C., outlines the restrictions and requirements for committed individuals placed in the community. Whitetail's exhibit outlining "community civil commitment conditions" follows the outline in N.D.C.C. 25–03.3–24(1). However, the restrictions and requirements are for a committed individual placed in the community as ordered by the district court after petition from the executive director. When a district court orders a respondent discharged from civil commitment, the district court loses authority to place restrictions and requirements upon the respondent because he no longer is a sexually dangerous individual as defined in N.D.C.C. ch. 25–03.3. *See In re Whitetail*, 2013 ND 143, ¶ 14, 835 N.W.2d 827. The district court did not err by concluding it lacked authority to place Whitetail on extended supervision.

V

[¶ 23] The district court order finding Whitetail a sexually dangerous individual was not induced by an erroneous view of the law and is supported by clear and convincing evidence. We affirm the district court order denying Whitetail's petition for discharge as a sexually dangerous individual.

[¶ 24] GERALD W. VANDE WALLE, C.J., LISA FAIR McEVERS and DALE V. SANDSTROM, JJ., concur.

KAPSNER, Justice, dissenting.

[¶ 25] I respectfully dissent.

[¶ 26] In 2013, I dissented from the majority's affirmance of the district court's holding that Nelson Whitetail Sr. is a sexually dangerous individual. *In re Whitetail*, 2013 ND 143, ¶¶ 18–31, 835 N.W.2d 827 (Kapsner, J., dissenting). I did so on the basis that there was then no current evidence that established Whitetail met the criteria of a sexually dangerous individual under N.D.C.C. ch. 25–03.3 or under *Kansas v. Crane*, 534 U.S. 407, 412, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002).

[¶ 27] Another year has passed, and this record provides even less evidentiary support for the statutory requirement that the State demonstrate Whitetail is "likely to engage in further acts of sexually predatory conduct which constitute a danger to the physical or mental health or safety of others." N.D.C.C. § 25–03.3–01(8); *In re G.R.H.*, 2006 ND 56, ¶ 6, 711 N.W.2d 587.

[¶ 28] Dr. Riedel, the expert who testified on behalf of Whitetail, reviewed the actuarial assessment of re-offending sexually and reported to the court:

The highest estimate produces a result that expects the odds to be 4 to 1 against Mr. White Tail reoffending sexually. The lowest has odds of almost 8 to 1 against reoffending sexually.

I realize that the North Dakota Supreme court in MBK v. Grossinger opined that these hearing[s] should not[ ] be a contest over numbers but when the numbers are so extremely low we should consider them somewhat commanding.

In relation to the *Crane* requirement I would state that he has not had any sexual or any other kind acting out since the instant offense so I think the best conclusion is that he currently is exhibiting an adequate amount of control and a great deal of direction in his treatment at NDSH.

(Footnote omitted.)

[¶ 29] But, perhaps more importantly, Dr. Lisota, who testified on behalf of the State, reported:

In light of these results, it is the undersigned's professional opinion that Mr. White Tail's actuarially assessed static (baseline) risk of sexual recidivism *does not* meet the criteria of "likely to engage in further acts of sexually predatory conduct" as defined by NDCC 25–03.3.

(Emphasis in original.)

[¶ 30] Dr. Lisota's report indicates Whitetail's raw score on his psychopathy test is 21 and "As such, Mr. White Tail's results on the PCL–R do not suggest that psychopathy is an aggravating factor with regard to his risk for sexual re-offense."

[¶ 31] Dr. Lisota's report stated that he did a "comprehensive review of Mr. White Tail's chart over the past year." His summary report was that "Mr. White Tail's attendance and participation in assigned groups has been excellent across the review period. He is not a behavior management problem, and actively provides good feedback for his peers and frequently serves in a 'mentor' role."

The undersigned asked Mr. White Tail's therapist, Daniel Everson, to provide a summary statement of his perspective of Mr. White Tail's treatment performance over the course of the review period. He provided the following information: "Mr. White Tail has been very consistent with his behavior and his progress in the program. He is taking his time to think about his recovery. He has taken responsibility for his offending behaviors. Mr. White Tail is active in the group and provides a lot of insight to other group members with his reflecting, relating, and challenging others to

look deeper into why they act or react a certain way in a reported situation. He is not afraid to confront others and is very willing to offer support."

. . . .

Impulsivity does not seem to be an issue for Mr. White Tail at this time, though he indicated it would be problematic if he was drinking or using drugs.

. . . .

Mr. White Tail indicated he is not ready for discharge at this time. He indicated this was "Because I've never dealt with my childhood issues. I've been through treatment for sex offenses, I'm finding now that my sexual offending was linked to my childhood. I have more than just the sexual offending to address in treatment."

[¶ 32] Despite the lack of any evidentiary showing that Whitetail is currently unable, based on his behavior or actuarial assessments, to control his behavior, Dr. Lisota's report recommends that Whitetail be found to be likely to engage in future sexually dangerous conduct on the following basis:

It is the undersigned's professional opinion that Mr. White Tail does not currently demonstrate "serious difficulty" controlling his behavior due to his application of treatment principles in a controlled environment. Were he to fall back into old patterns this would likely be problematic, and, most importantly, whether or not Mr. White Tail can maintain his current level of performance in a less restrictive environment remains to be seen.

"Remains to be seen" does not meet the statutory test of "likely to engage." "Remains to be seen" is just another way of saying "I don't know" and would apply to anyone who had ever engaged in criminal activity. Dr. Lisota's report does not articulate an evidentiary basis on which the district court can make a finding adverse to Whitetail under either the "likely to engage" prong of N.D.C.C. § 25–03.3–01(8) or under the substantive due process requirements of *Crane*. The State has failed to meet its burden to keep Whitetail committed.

[¶ 33] CAROL RONNING KAPSNER