2013 ND 143

**In the Interest of Nelson G. WHITETAIL, Sr.**

**Jessica J. Binder, State's Attorney, Petitioner and Appellee**

v.

**Nelson G. Whitetail, Sr., Respondent and Appellant.**

No. 20120452.

Supreme Court of North Dakota.

Aug. 29, 2013.

Jessica Jo Binder, State's Attorney, Stanton, N.D., petitioner and appellee.

Kent M. Morrow, Bismarck, N.D., for respondent and appellant.

VANDE WALLE, Chief Justice.

[¶ 1] Nelson Whitetail, Sr., appeals from an order finding he is a sexually dangerous individual and civilly committing him to the care, custody and control of the Department of Human Services. We affirm, concluding the district court did not err in finding the State established by clear and convincing evidence that Whitetail is a sexually dangerous individual.

I

[¶ 2] In 1988 Whitetail was convicted of two counts of gross sexual imposition. The victims were his girlfriend's two female children who were ages 3 and 5 at the time of the offenses. Whitetail was sentenced to 5 years in prison with 2 years suspended for 4 years. In 1997 Whitetail pled guilty to 6 counts of gross sexual imposition. As part of the plea agreement, 52 other counts of gross sexual imposition dating back to 1991 were dismissed. The victims were the same children he had earlier victimized leading to his 1988 conviction. Whitetail was sentenced to a total of 20 years in prison.

[¶ 3] Whitetail was scheduled to be released from prison in August 2012 and to be placed on parole until March 2013. Before Whitetail's scheduled release from prison, the State brought this petition to civilly commit Whitetail as a sexually dangerous individual under N.D.C.C. ch. 25–03.3. Two experts with different opinions whether Whitetail qualified as a sexually dangerous individual under the statutory requirements submitted reports and testified at the hearing. Whitetail also testified. The district court found there was clear and convincing evidence that Whitetail is a sexually dangerous individual and committed him to the care, custody and control of the Department of Human Services.

## II

[¶ 4] Whitetail's sole argument on appeal is that the district court erred in civilly committing him because there was not clear and convincing evidence that he is a sexually dangerous individual.

[¶ 5] Before a person can be committed as a sexually dangerous individual, the State must show by clear and convincing evidence that: 1) the individual has engaged in sexually predatory conduct; 2) the individual has a congenital or acquired condition that is manifested by a sexual disorder, a personality disorder, or other mental disorder or dysfunction; 3) the condition makes that individual likely to engage in further acts of sexually predatory conduct which constitute a danger to the physical or mental health or safety of others; and 4) the individual has serious difficulty controlling his behavior. *See In re Voisine*, 2010 ND 17, ¶ 9, 777 N.W.2d 908; N.D.C.C. § 25–03.3–01(8). We review civil commitments of sexually dangerous individuals under a modified clearly erroneous standard, and we will affirm the district court's decision unless the court's order is induced by an erroneous view of the law, or we are firmly convinced the order is not supported by clear and convincing evidence. *Voisine*, at ¶ 8. Claims that a court improperly relied on the opinion of one expert instead of another challenge the weight the evidence was assigned, not the sufficiency of the evidence, and this Court will not second-guess credibility determinations made by the court in sexually dangerous individual proceedings. *See In re J.T.N.*, 2011 ND 231, ¶ 8, 807 N.W.2d 570.

[¶ 6] If a court finds a person is a sexually dangerous individual, N.D.C.C. § 25–03.3–13 requires that the individual be placed in an appropriate treatment facility or program which "must be the least restrictive available treatment facility or program necessary to achieve the purposes of this chapter." The determination of the least restrictive treatment available is initially made by the executive director of the Department, but the individual may challenge his continued commitment if the statutory requirements are being violated. *See In re P.F.*, 2008 ND 37, ¶ 24, 744 N.W.2d 724; *see also Whelan v. A.O.*, 2011 ND 26, ¶ 7, 793 N.W.2d 471; *In re G.R.H.*, 2006 ND 56, ¶¶ 22, 27, 711 N.W.2d 587.

[¶ 7] There is no dispute that the first two elements for determining whether a person is a sexually dangerous individual have been satisfied. Whitetail's 1988 and 1997 convictions establish he engaged in sexually predatory conduct. Dr. Jennifer Krance, the State's expert witness, diagnosed Whitetail with Paraphilia NOS (Pedophilia and Hebephilia) and an antisocial personality disorder with narcissistic features. Dr. Robert Riedel, Whitetail's expert witness, diagnosed Whitetail with "R/O Dysthymic Disorder," a history of alcohol and cannabis dependence in long term remission in a controlled environment, a history of sexual abuse both as a perpetrator and a victim, and "R/O Antisocial Personality Disorder." Both experts testified that their respective diagnoses meet the criteria for a condition that is manifested by a sexual disorder, a personality disorder, or other mental disorder or dysfunction.

[¶ 8] The expert opinions differed on the question whether Whitetail was likely to engage in further acts of sexually predatory conduct which constitute a danger to the physical or mental health or safety of others. Dr. Riedel testified that Whitetail scored a +2 on the Static 99–R and a +5 on the MnSOST–R, indicating a low probability of reoffending. Although acknowledging that this Court ruled to the contrary in *In re M.B.K.*, 2002 ND 25, ¶ 18, 639 N.W.2d 473 (N.D.C.C. § 25–03.3–13 "allows experts to use the fullness of their

education, experience and resources available to them" in determining whether individual is a threat to society), Dr. Riedel suggested the use of actuarial test scores is the best technique for determining a person's likelihood to reoffend. Dr. Riedel pointed to Whitetail's successful completion of sexual offender treatment programs at the prison, once following his 1988 conviction and the other following his 1997 conviction, as further lessening his likelihood of reoffending. Dr. Riedel noted Whitetail's lack of major "write ups" and his achievements during his second incarceration. Dr. Riedel acknowledged that Whitetail's actuarial numbers after his first imprisonment would have also indicated a low risk of reoffending, but he also maintained the current likelihood of Whitetail reoffending was "minuscule."

[¶ 9] Dr. Krance stated in her report that Whitetail's diagnosis in itself indicated he was likely to reoffend:

It is concluded that a nexus exists linking Mr. White Tail's [sic] Personality Disorder to his sexual offending in that his pattern of sexually predatory conduct is characterized by predatory offending, impulsivity, deceitfulness, aggression and a lack of remorse for his victims. It is widely accepted that the best predictor of future behavior is past behavior. Given that Mr. White Tail [sic] has a history of engaging in sexual contact with minor females, it is likely that his paraphilia in combination with his personality disorder will lead him to engage in future acts of sexually predatory conduct. However, the behaviors prompted by either of these diagnoses alone would also likely lead him to engage in sexually predatory conduct.

Dr. Krance noted in her report that Whitetail's score of 21 on the Psychopathy Checklist–Revised (PCL–R) "indicate[s] that he is unusually detached, cold, grandiose, manipulative, willing to lie, and lack-

ing in empathy and remorse," and that "[t]hese traits make it highly likely that he will act in ways that harm others with little or no regard for their feelings or welfare, possibly including in a sexually offensive manner." Dr. Krance further stated in her report that Whitetail's completion of sexual offender treatment programs at the prison did not lessen his likelihood of reoffending:

Mr. White Tail [sic] completed sex offender treatment on two separate occasions (1990 and 2012). However, this cannot be considered a protective factor against further acts of sexually predatory conduct given the fact he went on to sexually reoffend against the same victims whom he had offended against during his 1988 conviction. While Mr. White Tail [sic] may be able to verbalize understanding of his risks and interventions for sexually offensive behavior, he has demonstrated in the past that he is unable or unwilling to put that understanding into practice when placed within an unstructured environment.

[¶ 10] Dr. Riedel opined that Whitetail does not have serious difficulty controlling his behavior because "he has not had any sexual or any other kind [of] acting out since the instant offense so I think the best conclusion is that he currently is exhibiting an adequate amount of control." Dr. Krance disagreed:

While it appears Mr. White Tail [sic] has not demonstrated serious difficulty controlling his sexual behavior while at NDSP, this must be interpreted within the context of an artificial treatment environment. For example, if an individual demonstrates "serious difficulty" in the treatment setting, it is logical to conclude that their behavior would not improve in a less restrictive environment. Conversely, if an individual does not demonstrate "serious difficulty" in a

residential treatment setting, it cannot be inferred this will generalize to a community setting without actual exposure to such a setting.

Mr. White Tail [sic] was given an opportunity to control his sexual behavior within the community upon release from NDSP on July 23, 1990, after completion of sex offender treatment. However, Mr. White Tail [sic] proceeded to place himself in a high risk environment by resuming his relationship with the mother of his two female victims from the 1988 GSI convictions. He sexually reoffended against both female victims and the sexual acts progressed from fondling and oral sex to sexual intercourse. Mr. White Tail [sic] was later brought up on charges that were dismissed with prejudice through plea agreement. These charges reflected that Mr. White Tail [sic] began sexually reoffending roughly six months upon release from prison (January 1991 to September 1996) while on probation. Mr. White Tail [sic] acknowledged in treatment he would have continued sexually offending against his female victims had he not been caught. His behaviors over the years are indicative of serious difficulty controlling his behavior and it would be important for him to demonstrate an ability to do so in a less restrictive environment before being released, once again, to the community.

[¶ 11] Dr. Riedel recommended that Whitetail be released but that "the Court consider extended supervision which would lower his chances of recidivism even more tha[n] the currently very low estimates and this would provide him with more direction and support services as well." Whitetail testified about the reasons for his "write ups" at the prison and said he would be willing to be placed on extended supervision upon release. Dr. Krance recommended commitment and testified about the possibility of "outpatient civil commitment" where people reside in a "transitional living facility" on the grounds of the State Hospital before being released to the community.

[¶ 12] In finding Whitetail is a sexually dangerous individual, the district court explained in its December 2012 decision:

3. Mr. Whitetail's conduct while incarcerated is disturbing to the court. He immediately enters sex offender education class in 1997 and is given high marks upon completion. Then is recommended to enter intensive sex offender treatment and declines. Receives a write up for not complying and immediately signs up. Mr. Whitetail basically mails it in for the next ten years and when parole might be in sight he begins to apply himself. No more write ups and completes ISO. This looks no different from his incarceration after his first sex offense convictions where he completed ISO, was released to probation and quite frankly reoffended immediately.

4. The Court does not buy into Dr. Riedel's opinion that Mr. Whitetail has a miniscule re-offense probability due to his actuarial scores. Mr. Whitetail has already shown he has serious difficulty controlling his disorder and reoffended sexually on the same victims. Probation or sex offender treatment did not act as a guard or prophylactic for his chosen victims.

5. To follow Dr. Riedel's comments of how the actuarial tables are the best predictor to determine the chance to reoffend, is simply hocus-pocus. By Dr. Riedel's own statement, Mr. Whitetail's actuarial numbers would have been lower after his first incarceration yet he reoffended. To rely

on actuarial numbers already proven to be wrong is unacceptable.

6. Mr. Whitetail has not shown the ability to be in the community through his own actions. He is on parole until March of 2013 so DOC's ability to supervise him or require him to continue to participate in sex offender treatments is limited to the next three months.

7. This Court finds Dr. Krance's diagnosis of Paraphilia and Antisocial Personality Disorder with Narcissistic features as persuasive. These two diagnosis [sic] combined, according to Dr. Krance, will make it likely Mr. Whitetail will criminally re-offend and likely sexually re-offend.

8. Dr. Krance's observation that Mr. Whitetail appears to be able to recognize and understand his risks and interventions, but demonstrates he is either unwilling or unable to put into practice his understanding is spot on.

9. The Court finds Mr. Whitetail has demonstrated serious difficulty controlling his disorders and will continue to do so. Mr. Whitetail's re-offense is paramount in this Court finding. Mr. Whitetail continued to show his Antisocial Personality Disorder with Narcissistic features by accumulating write ups while incarcerated for his second set of offenses and how he acted in his treatment until he was close to seeing the parole board. The Court finds by clear and convincing evidence Mr. Whitetail is a Sexually Dangerous Individual.

[¶ 13] Whitetail argues Dr. Krance failed to provide "any valid explanation" for using the "original norms" for the MnSOST–R, which he contends "overestimates recidivism," rather than the "new norms" which are "more accurate." How-ever, Dr. Krance acknowledged the new norms "may offer a better estimate of an offender's current threat of recidivism ... given high risk *and* intensive risk management in the community," but said the new norms would apply only if Whitetail had "intensive community supervision upon release" and he "has proven to be very difficult to supervise in the community already." Dr. Krance therefore concluded Whitetail's "risk is more appropriately characterized as similar to the original norms at 54% over six years." Dr. Krance provided a reasonable explanation for using the original norms.

[¶ 14] Whitetail also argues Dr. Krance and the district court unduly focused on his past behavior and his need to demonstrate an ability to control his behavior in a less restrictive environment before being released to the community. He claims this places him in a "Catch 22" situation from which he cannot escape. However, the court relied on other evidence as well in deciding Whitetail is a sexually dangerous individual, and a person's past conduct is certainly a relevant consideration. *See In re R.A.S.*, 2009 ND 101, ¶ 20, 766 N.W.2d 712. Furthermore, as we have pointed out, Whitetail is entitled under N.D.C.C. § 25–03.3–13 to be placed in the "least restrictive available treatment facility or program necessary." Notwithstanding his desire for extended supervision, Whitetail has not informed us how, without a civil commitment under N.D.C.C. ch. 25–03.3, the State could legally exercise the extensive supervision recommended by both experts upon his release from prison. *See State v. Garvin*, 329 N.W.2d 621, 623 (N.D.1983) (sentencing court may not increase a legally imposed sentence); *State v. Bryan*, 316 N.W.2d 335, 338 (N.D.1982) (same).

[¶ 15] Having considered the entire record, we conclude the district court's

order finding Whitetail a sexually dangerous individual was not induced by an erroneous view of the law and is supported by clear and convincing evidence.

## III

[¶ 16]   The order is affirmed.

[¶ 17]   DALE V. SANDSTROM, DANIEL J. CROTHERS, and MARY MUEHLEN MARING, JJ., concur.

KAPSNER, Justice, dissenting.

[¶ 18]   Nelson G. Whitetail, Sr. committed terrible crimes against two children in 1988 and again in 1997.   For those crimes, he has received the punishments exacted by the criminal justice system.   I respectfully dissent because it is clear from the evidence that this civil commitment is based upon his past crimes and not upon his present status.

[¶ 19]   We have said that a finding is clearly erroneous when there is no evidence to support it.   *See, e.g., In re S.R.B.*, 2013 ND 109, ¶ 29, 832 N.W.2d 42.   The evidence offered in this case does not establish that Whitetail is presently a sexually dangerous individual.

[¶ 20]   As acknowledged by both experts, Whitetail satisfies the first two prongs of the statute.   However, to deprive Whitetail of his freedom in a civil commitment, the State must prove that he is today, not in 1997, an individual likely to engage in further acts of sexually predatory conduct, which constitute a danger to the physical or mental health or safety of others.   *In re A.M.*, 2010 ND 163, ¶ 13, 787 N.W.2d 752.   The burden is on the State and the burden is by clear and convincing evidence.   N.D.C.C. § 25–03.3–13. The burden is to show that the respondent *is* a sexually dangerous individual, not that he *was* a sexually dangerous individual. *Id.* Not only was this burden not met by the evidence presented, but the court

seems to suggest that the burden is on the respondent to prove that he will not act in conformity with his past crimes.   The district judge stated:

> Dr. Krance concedes Mr. Whitetail has not demonstrated serious difficulty controlling his sexual behavior while in a treatment setting, but he has shown serious difficulty in a less restrictive environment by committing further sexual offenses while on probation, after sex offender treatment and incarceration for the very same offenses on the very same victims.   His track record speaks for itself.   Dr. Krance notes Mr. Whitetail acknowledged in treatment he would have continued sexually offending against his female victims had he not been caught.   Mr. Whitetails' behaviors over the years are indicative of serious difficulty controlling his behavior and it would be important for him to demonstrate an ability to do so in a less restrictive environment before being released, once again, to the community.

[¶ 21]   The district judge is relying on Whitetail's criminal history, the last event of which occurred in 1997.   "The Court finds Mr. Whitetail has demonstrated serious difficulty controlling his disorders and will continue to do so.   Mr. Whitetail's re-offense is paramount in this Court finding."   Dr. Krance, the State's expert, similarly acknowledged that she is reliant primarily on his sexual crimes that occurred 15 years before the hearing on this civil commitment.

> Q   Okay. But primarily your concern is serious difficulty and in controlling behaviors, sexual reoffending shortly after his release?
>
> A Yes.
>
> Q   That's the primary reason for your opinion?
>
> A Yes, I would say that.

[¶ 22] The State's expert noted that even having received sex offender treatment during his first incarceration, Whitetail offended with the same victims after his release. This important piece of information would surely weigh heavily if it were supported by current information that fulfilled the third factor (likely to engage in further acts of sexually predatory conduct which constitutes a danger to others) and the requirements of *Kansas v. Crane,* 534 U.S. 407, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002) (having serious difficulty controlling his behavior).

[¶ 23] Both the court and the State's expert focused on fifteen-year-old information while ignoring other, uncontradicted information presented that Whitetail has demonstrated ability to control and to learn to control his actions. Dr. Krance's report diagnosed Whitetail with "Alcohol Dependence Sustained Full Remission, In a Controlled Environment." She asserted a relapse "could increase his risk of engaging in sexually predatory conduct...." Yet, on cross-examination, Dr. Krance acknowledged there was no indication that Whitetail had abused alcohol since 1986 or that it had played any part in his reoffense:

Q Okay. Now, you indicated in terms of alcohol dependence that his self-reporting is, he's not abused alcohol since 1986.

A I believe 1987 is what I have, yeah.

Q Okay. So last 25 years he hasn't. Whether it's been in a controlled setting or not, there has been no alcohol abuse?

A That we're aware of, yes.

Q Including ten years that he was out, or the period of time that he was out in the community before he reoffended?

A That's to the knowledge that I have, yes, there was nothing indicated that he was abusing alcohol or cannabis.

[¶ 24] Dr. Krance was questioned about Whitetail's prison record:

Q Okay. And essentially, his ability to control his behavior in general is pretty limited. I mean, his ability to control it has been demonstrated in the penitentiary by his limited disciplinary history?

A I would agree with that, that he has an ability to follow the rules. He has demonstrated that, yes.

[¶ 25] Dr. Krance's testimony was that she did not know the difference between the sex offender treatment Whitetail received during his first incarceration and that received during his second term. However, she recognized some apparent effects from the later treatment, which was a three-year-long, five-stage treatment Whitetail completed five months before the hearing:

Q Okay. And his colleagues of the sexual offender treatment indicate some self-awareness of his difficulty in controlling sexually. He has developed tools to manage his risk?

A Yes, I would agree that there is some awareness of that, if he was aware of completing that, yes.

Q Part of the record indicates that he became a somewhat leader in the program?

A Yes.

Q And helpful to other inmates going through the same process?

A That's true.

Q And he recognized his offending?

A Yes, I believe so.

However, she would not consider the sex offender treatment in the penitentiary in 2009 through 2012 beneficial because of his 1997 offenses. The district court accepts this reasoning, making this civil commitment simply an extension of the punish-

ment for his past crimes, not an effort to address his current status.

[¶ 26] The district court's finding on Whitetail's lack of ability to control his behavior is:

The Court finds Mr. Whitetail has demonstrated serious difficulty controlling his disorders and will continue to do so. Mr. Whitetail's re-offense is paramount in this Court finding. Mr. Whitetail continued to show his Antisocial Personality Disorder with Narcissistic features by accumulating write ups while incarcerated for his second set of offenses and how he acted in his treatment until he was close to seeing the parole board. The Court finds by clear and convincing evidence Mr. Whitetail is a Sexually Dangerous Individual.

[¶ 27] Dr. Krance did not testify at the hearing on any behavioral problems in prison. However, her report notes:

While incarcerated at NDSP, Mr. White Tail did well behaviorally for the most part. However, he did receive an A-43 write up for conduct which disrupted or interfered with the security or orderly running of the institution in 1997 when he refused to do what staff asked him to do on two separate occasions. Mr. White Tail has received various minor infractions for loaning, borrowing, or being in possession of another inmate's property (three), disobeying a verbal or written order from staff (four), and disorderly conduct (horseplay). To his credit, the last minor rule infraction occurred in January 2010.

[¶ 28] This evidence from Dr. Krance's report appears to be the write-up on which the district court bases its conclusion that Whitetail will continue to have "serious difficulty controlling his disorders." This Court must exercise a "modified clearly erroneous" standard of review to commitments under N.D.C.C. ch. 25–03.3 to determine if the findings are supported by clear and convincing evidence. *In re G.R.H.*, 2006 ND 56, ¶ 8, 711 N.W.2d 587. The evidence is neither clear nor convincing.

[¶ 29] Further, we must be concerned with the findings under the constitutional standard announced in *Kansas v. Crane*:

[*Kansas v. Hendricks*, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) ] underscored the constitutional importance of distinguishing a dangerous sexual offender subject to civil commitment "from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings." That distinction is necessary lest "civil commitment" become a "mechanism for retribution or general deterrence"— functions properly those of criminal law, not civil commitment.

*Crane*, 534 U.S. at 412, 122 S.Ct. 867 (internal citations omitted).

[¶ 30] Whitetail had what appears to be a serious write-up in 1997. Dr. Krance describes every other write-up as a "minor infraction," and the most recent "minor infraction" was two years prior to the hearing.

[¶ 31] Under the modified clearly erroneous standard of review, I am firmly convinced that the State has failed in its burden to show that Whitetail currently meets the statutory criteria for civil commitment under N.D.C.C. ch. 25–03.3. The evidence fails to show that he is dangerous, much less sexually dangerous. It also fails to show that Whitetail currently has serious difficulty controlling his behavior. The State has failed to meet its burden.

[¶ 32] I respectfully dissent.

[¶ 33] CAROL RONNING KAPSNER