Filed 8/25/15 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2015 ND 207

In the Matter of J.G.

Brian D. Grosinger, Morton County 

Assistant State’s Attorney, Plaintiff and Appellee

v.

J.G., Defendant and Appellant

No. 20140448

Appeal from the District Court of Morton County, South Central Judicial District, the Honorable James S. Hill, Judge.

AFFIRMED.

Opinion of the Court by VandeWalle, Chief Justice.

Brian D. Grosinger, Assistant State’s Attorney, 210 Second Avenue Northwest, Mandan, N.D. 58554, plaintiff and appellee.

Kent M. Morrow, 411 North Fourth Street, Bismarck, N.D. 58501, for defendant and appellee.

Matter of J.G.

No. 20140448

VandeWalle, Chief Justice.

[¶1] J.G. appealed from an order finding he continues to be a sexually dangerous individual and civilly committing him to the care, custody, and control of the executive director of the Department of Human Services for placement in the least restrictive facility or program.  Because the district court’s findings of fact are supported by clear and convincing evidence, we affirm.

I

[¶2] In November 2002, J.G. was initially committed as a sexually dangerous individual based on the crime of indecent exposure which occurred when he was 12 years old.  J.G. has unsuccessfully petitioned for discharge numerous times since his initial commitment, and 
Matter of J.G.
, 2013 ND 26, 827 
N.W.2d
 341, is the latest reported decision of this Court concerning J.G.  In that case, this Court held the 2002 finding that J.G. engaged in sexually predatory conduct was res judicata and could not be relitigated.  
Id.
 at ¶ 11.  We also affirmed the district court’s reliance on the opinion of Dr. Robert Lisota, the State’s expert witness, in finding J.G. was likely to reoffend based on a number of dynamic risk factors he found to be “problematic.”  
Id.
 at ¶ 13.  J.G.’s expert witness, Dr. Stacey Benson, had opined that use of actuarial risk assessment instruments was inappropriate because they are intended for juveniles, 
id.
 at ¶ 12, but we concluded the court’s finding J.G. was likely to reoffend was not clearly erroneous because the court “found Dr. Lisota’s testimony more credible.”  
Id.
 at ¶ 15.  We recognized that J.G.’s cognitive difficulties made it more challenging for him to complete his treatment program, but the danger he “presents remains paramount.”  
Id.
 at ¶ 14.

[¶3] 
After an annual review hearing in March 2014, during which Dr. Lisota and Dr. Benson again testified, the district court found J.G. continued to be a sexually dangerous individual and ordered that he be treated at the Community Transitional Center (“CTC”) at the State Hospital as the least restrictive environment, based on the recommendation of Dr. Benson.  The State moved for a new trial, arguing the court’s findings were insufficient to sustain the commitment and the CTC is not an appropriate alternative treatment program.

[¶4] Another hearing was held before a different judge in November 2014 during which additional testimony was provided by Kerry Wicks, the clinical director of the sex offender program and clinical administrator for all clinical services at the State Hospital.  He testified no one has been placed in the CTC without first completing the sex offender treatment program and J.G. has not progressed to that point.  Based on the evidence provided at the March 2014 hearing and Wicks’ testimony, the district court granted the State’s motion, again found J.G. remains a sexually dangerous individual, refused to order his placement at the CTC, and ordered the executive director of the Department place him in the least restrictive treatment facility or program.

II

[¶5] J.G. argues the district court’s decision is not supported by clear and convincing evidence.

[¶6] In 
Interest of Johnson
, 2015 ND 71, ¶¶ 4-5, 861 
N.W.2d
 484, we explained our standard of review in these cases:

A “modified clearly erroneous” standard of review is employed by this Court when reviewing the civil commitment of sexually dangerous individuals under N.D.C.C. ch. 25-03.3.  
Matter of J.T.N.
, 2011 ND 231, ¶ 6, 807 N.W.2d 570.

We will affirm a trial court’s order denying a petition for discharge unless it is induced by an erroneous view of the law or we are firmly convinced it is not supported by clear and convincing evidence.  In reviewing the trial court’s order, we give great deference to the court’s credibility determinations of expert witnesses and the weight to be given their testimony.  The trial court is the best credibility evaluator in cases of conflicting testimony and we will not second-guess the court’s credibility determinations.

Matter of Wolff
, 2011 ND 76, ¶ 5, 796 N.W.2d 644 (internal citations and quotations omitted).

At a discharge hearing, the state has the burden of proving by clear and convincing evidence that the committed individual remains a sexually dangerous individual.  N.D.C.C. § 25-03.3-18(4).  To prove a committed individual remains a sexually dangerous individual, the State must show three statutory elements: (1) the individual has engaged in sexually predatory conduct, (2) the individual has a congenital or acquired condition that is manifested by a sexual disorder, a personality disorder, or other mental disorder or dysfunction, and (3) the individual’s condition makes them likely to engage in further acts of sexually predatory conduct which constitute a danger to the physical or mental health or safety of others.  
Interest of Corman
, 2014 ND 88, ¶ 8, 845 N.W.2d 335; 
see also
 N.D.C.C. § 25-03.3-01(8).  In addition, substantive due process requires proof that the individual has serious difficulty controlling his behavior.  
Matter of J.G.
, 2013 ND 26, ¶ 9, 827 N.W.2d 341.  This Court has also construed the definition of a sexually dangerous individual to “require a nexus between the disorder and dangerousness, which distinguishes such an individual from other dangerous persons.”  
Id.
 (citation omitted).

[¶7] The first two requirements are not challenged here because the sexually predatory conduct issue is res judicata and the expert witnesses agreed J.G. had mental and personality disorders.  
J.G. contends there is not clear and convincing evidence to satisfy the requirement under 
N.D.C.C. §  25-03.3-01(8) that he is “likely to engage in further acts of sexually predatory conduct which constitute a danger to the physical or mental health or safety of others” and the due process requirement that he has serious difficulty controlling his behavior. 

[¶8] The position of the experts in this case mirrors in many respects the positions they took in 
J.G.
, 2013 ND 26, 827 
N.W.2d 341.  According to Dr. Lisota, although J.G. has made some progress, he has not satisfactorily progressed in the sex offender treatment program.  
Dr. Lisota opined J.G. continues to pose a high risk of reoffending and again listed numerous dynamic risk factors that were either “problematic” or “partially problematic”:  significant social influences, hostility toward women, general social rejection/loneliness, lack of concern for others, impulsive, poor cognitive problem solving, negative emotionality, sex drive/sexual preoccupation, deviant sexual preference, and cooperation with supervision.  Dr. Benson opined J.G. was not at high risk of reoffending because he has matured, his index offense was committed as a juvenile, and he has no adult convictions.

[¶9] The district court found:

Dr. Lisota and Dr. Benson dispute whether [J.G.] is likely to engage in future sexually predatory conduct but agree traditional actuarial risk assessments are not appropriately applied to [J.G.’s] case because he committed his index offense as a twelve-year-old juvenile and is now a thirty-year-old adult.  Dr. Lisota believes [J.G.] continues to pose a high risk of reoffending because his risk was high at the time he was originally committed and he has failed to successfully participate in sex offender treatment that would reduce his risk of reoffending.

Dr. Benson believes determining [J.G.’s] likelihood of engaging in future sexually predatory conduct is difficult because actuarial risk assessment tools are not available and relying on clinical judgment is not favorable because it is not supported by science.  Dr. Benson believes [J.G.] is not likely to reoffend because he has only been convicted of one incident, indecent exposure, which occurred when he was twelve years old.  In addition, [J.G.] has only one victim, has never offended as an adult, and has been civilly committed for the past twelve years.  In contrast, Dr. Benson indicated [J.G.’s] history of impulsiveness would raise his risk of reoffending.  Additionally, Dr. Benson believes [J.G.] has matured and made significant progress, but on the other hand suggests it will be nearly impossible for [J.G.] to successfully complete sex offender treatment due to his cognitive deficits and the lack of treatment accommodations to account for his cognitive delays.

Dr. Lisota’s testimony regarding [J.G.’s] failure to successfully progress in treatment is corroborated by Wicks’s testimony regarding the inappropriateness of placing [J.G.] at the CTC where no supervision exists. This Court is persuaded by Dr. Lisota’s and Wicks’s testimony and concludes [J.G.] is likely to engage in future sexually predatory conduct if he were to be discharged or transferred to a less restrictive environment, such as the CTC.

Dr. Lisota and Dr. Benson disagree as to whether [J.G.] will have serious difficulty in controlling his behavior.  Dr. Lisota believes [J.G.] has done little to progress in treatment despite statements to the contrary.  Dr. Benson believes [J.G.’s] inability to progress in treatment is not a result of lack of motivation on [J.G.’s] part, but rather, is due to the lack of accommodations made in [J.G.’s] treatment program for his cognitive deficits and learning disabilities.  Regardless of the cause of [J.G.’s] failure to progress in treatment, both doctors agree, and this Court concludes, [J.G.] has failed to complete his assigned sex offender treatment program.

Dr. Benson believes [J.G.] no longer has serious difficulty controlling his behavior, but indicates his behavioral issues have been misinterpreted as evidence of lack of motivation because it is typical of individuals with lower cognitive functioning.  Dr. Lisota disagrees, believing [J.G.] has serious difficulty controlling his behavior because he cannot control his behavior well enough to successfully progress through treatment.  In addition, Wicks testified [J.G.] requires regular behavioral reminders and would not be an appropriate candidate for placement at CTC at this time.  This Court concludes [J.G.] continues to have serious difficulty controlling his behavior.

[¶10] From our review of the record, we conclude the district court’s finding J.G. remains a sexually dangerous individual is supported by clear and convincing evidence.

III

[¶11] J.G. argues the district court erred in refusing to order that he be committed to the CTC as the least restrictive treatment facility or program.

[¶12] Section 25-03.3-13, N.D.C.C., provides in pertinent part:

If the respondent is found to be a sexually dangerous individual, the court shall commit the respondent to the care, custody, and control of the executive director.  The executive director shall place the respondent in an appropriate facility or program at which treatment is available.  The appropriate treatment facility or program must be the least restrictive available treatment facility or program necessary to achieve the purposes of this chapter.  The executive director may not be required to create a less restrictive treatment facility or treatment program specifically for the respondent or committed individual.

We have held the “determination of the least restrictive treatment available is initially made by the executive director of the Department, but the individual may challenge his continued commitment if the statutory requirements are being violated.”  
Interest of Whitetail
, 2013 ND 143, ¶ 6, 835 N.W.2d 827; 
see also
 
Whelan v. A.O.
, 2011 ND 26, ¶ 7, 793 N.W.2d 471; 
Interest of P.F.
, 2008 ND 37, ¶ 24, 744 N.W.2d 724; 
In re G.R.H.
, 2006 ND 56, ¶¶ 22, 27, 711 N.W.2d 587.  In 
A.O.
, at ¶¶ 7-8, we affirmed a district court decision in a discharge hearing that the executive director had not violated the statute because the respondent presented no evidence establishing a less restrictive treatment program or facility than the State Hospital, and the State had presented evidence the respondent’s treatment at the State Hospital was the least restrictive program.

[¶13] Here, Wicks testified that the CTC is an unstaffed house on campus for placement of persons who are at “stage three in the traditional sex offender program.”  Wicks testified J.G. is relatively “[e]arly” and on the “verge . . . of moving into . . . the skills programs,” but acknowledged that placing J.G. in the CTC at this point would be analogous to “pull[ing] him out of the second grade and put[ting] him into college.”

[¶14] The dissent’s frustration with the current statutes is understandable and shared by members of the Court.  However, here there was no direct attack on the statutes.  Rather, in an attempt to accommodate the tension, the dissent chooses the CTC as the “least restrictive treatment facility or program necessary to achieve the purposes” of the chapter governing civil commitment of sexually dangerous individuals.  As the dissent recites, Dr. Benson recommended that “we next 
explore
 if he is appropriate for a less restrictive environment.  That 
may be
 the CTC home on the NDSH grounds . . . .” (emphasis supplied).  It is obvious that Dr. Benson was not recommending CTC as the alternative but only suggesting it be explored.  However, as we have already noted, there was direct testimony from Kerry Wicks that the CTC was not appropriate.  Our frustration with the tension in the statutes cannot justify a result not supported by the evidence.

[¶15] We conclude the district court’s finding that “[a]lthough [J.G.] has made some progress in recent years, he has not successfully completed a sex offender treatment program, thus making transition to CTC or complete discharge inappropriate at this time” is supported by clear and convincing evidence.

IV

[¶16] The order is affirmed.

[¶17] Gerald W. VandeWalle, C.J.

Daniel J. Crothers

Lisa Fair McEvers

I concur in the result.

Dale V. Sandstrom

Kapsner, Justice, dissenting.

[¶18] I respectfully dissent.

[¶19] The State has deprived J.G. of his freedom since 2002.  The initial basis was the crime of indecent exposure, which occurred when he was twelve years old.  Whether this act was sexually predatory conduct has to be reviewable as to the initial commitment, but at some point, the finding becomes res judicata and we have so held.  
Matter of J.G.
, 2013 ND 26, ¶ 11, 827 N.W.2d 341.

[¶20] J.G. now challenges his continuing commitment because he asserts that the State has not established by clear and convincing evidence that he remains a sexually dangerous individual.  He also challenges whether the trial court has authority under N.D.C.C. § 25-03.3-13 to designate a specific treatment program as long as it does not require the creation of a specific program solely for the respondent.

[¶21] Section 25-03.3-13, N.D.C.C., provides in part:

The executive director shall place the respondent in an appropriate facility or program at which treatment is available.  The appropriate treatment facility or program must be the least restrictive available treatment facility or program necessary to achieve the purposes of this chapter.  The executive director may not be required to create a less restrictive treatment facility or treatment program specifically for the respondent or committed individual.

This case focuses our attention on the tension in the statute.  A committed individual is entitled to treatment in an appropriate facility or program and to the least restrictive treatment available, but the executive director does not have to create any programs for a committed individual.  J.G. is continuing to be held as a sexually dangerous individual primarily because he has “failed to complete his assigned sex offender treatment program.”  How does a trial court treat such an individual under the above statute when the court has evidence that the individual, after twelve years of confinement, is incapable of completing the treatment, as designed, because of the inherent disabilities of the individual?  Does the court simply allow the individual to continue to be deprived of his freedom or may the court fashion an order based upon the evidence it has received and an existing treatment center suggested by the expert as a possibility?

[¶22] In March 2014, district judge Donald L. Jorgensen, after receiving the testimony of Dr. Stacey Benson and Dr. Robert Lisota at a discharge hearing, ordered J.G. be transferred to the Community Transitional Center at the State Hospital.  His conclusions were as follows:

As seen by [J.G.’s] lengthy history of treatment, assessments, and civil commitments, [J.G.] has and will continue to have significant obstacles and difficulties in his life.  Still, the record shows substantial progress in recent years.  Under North Dakota law, [J.G.] is entitled to the least restrictive treatment option available to him.  Bearing in mind his progress and his need for individualized treatment that reflects his cognitive delays, this Court believes CTC will provide the appropriate level of treatment for [J.G.].  Upon consideration of [J.G.’s] treatment records, medical examinations and assess[]ments, the briefs, and the lengthy file, this Court deems it prudent to transition [J.G.] into the CTC on the NDSH campus for a period of one year effective immediately.

[¶23] The State brought a motion for a new trial alleging that “ordering specific placement of the Respondent . . . is outside of the authority of Section 25-03.3-13 of the North Dakota Century Code.”  Effectively, the State is asserting the mandate of N.D.C.C. § 25-03.3-13 is non-reviewable.  Yet, the statute says, “The executive director 
shall
 place the respondent in an appropriate facility or program at which treatment is available.  The appropriate treatment facility or program 
must
 be the least restrictive available treatment facility or program necessary to achieve the purposes of this chapter.”  N.D.C.C. § 25-03.3-13 (emphasis added).  We have already held that some form of judicial review is available under N.D.C.C. ch. 25-03.3.  
Interest of P.F.
, 2008 ND 37, ¶ 24, 744 N.W.2d 724.  The district court had the evidence to enter the order it did in 2014.  The current proceeding is an effort to disregard the authority of the court to exercise judicial review under N.D.C.C. § 25-03.3-13.

[¶24] It should be noted that this record is absolutely devoid of any indication of recent dangerousness by J.G.  There are no findings of sexually acting out.  The entirety of findings that relate to current behavior consist of the following:

Dr. Lisota indicated [J.G.] showed an understanding of treatment principles but is unable to apply them consistently. [J.G.] has been on a behavior plan that rewards him for positive behaviors.  This plan appears to be somewhat successful because the number of write-ups received by [J.G.] has decreased, although he continues to require regular behavioral reminders and still receives write-ups.  Dr. Lisota found [J.G.] continues to display inappropriate contact with staff and other residents, has difficulty accepting group feedback, and has failed to progress to an actual treatment stage within the program.  Dr. Lisota found [J.G.] has failed to adequately participate in intensive sex offender treatment and therefore continues to experience pedophilic and non-consent interests.

[¶25] The court’s reliance on Dr. Lisota’s “failure to progress in treatment” analysis is particularly troublesome.  Dr. Lisota’s report makes it clear that Dr. Lisota believes that failure to progress in treatment, even the 
inability
 to progress in treatment, satisfies the constitutional requirement articulated in 
Kansas v. Crane
, 534 U.S. 407, 413 (2002) (holding substantive due process requires proof that the individual facing commitment has serious difficulty controlling his behavior).  Dr. Lisota’s analysis of 
Crane
, quoted below, does not require the State to prove that J.G. currently has any difficulty controlling his behavior; rather, it puts the burden on J.G., and the court has accepted this analysis:

The fourth item (not a prong in North Dakota’s SDI law) which needs to be addressed is the “Serious Difficulty” issue raised in 
Kansas v. Crane
 and 
Kansas v. Hendricks
.  At the heart of the matter is whether or not the Respondent can be distinguished from “dangerous but typical” sexual recidivist. [J.G.] is distinguished from the “dangerous but typical” recidivist by his apparent inability to progress in treatment, despite having been at NDSH for approximately 14 years.  Furthermore, the Respondent continues to demonstrate “serious difficulty” by failing to engage in treatment.  Numerous Supreme Court findings indicating that failure to comply with or complete treatment is grounds to support continued commitment:

MD
 (1999)

Barrera
 (2008)

EWF
 (2008)

MD
 (2008)

GRH
 (2008)

TO
 (2009)

 

In summary, perhaps the most concise way to address the issue of whether or not [J.G.] remains an SDI under North Dakota statute is to review what has changed since he was found by the Court to be an SDI in 2002. [J.G.] remains in a pre-treatment group, continues to struggle with behavioral issues in group and on the unit, and appears to lack motivation to succeed despite statements to the contrary. [J.G.] has done nothing of any substance to demonstrate he has reduced his risk for sexual recidivism through treatment participation as of the date of this report.

[¶26] There are eighteen pages of treatment notes attached to Dr. Lisota’s report, spanning the time frame from March 19, 2013, to February 18, 2014.  In those eighteen pages of treatment notes, there is no suggestion that J.G. has failed to participate in a treatment session or to complete an outside assignment.  However, the most often used phrases to describe the journals J.G. is required to keep are “routine and unexceptional” or “routine and un-noteworthy.”  This addresses J.G.’s 
ability
 to participate in what his therapists consider a meaningful manner.  Dr. Lisota considered the 
lack
 of ability a sufficient reason for continued confinement.

[¶27] J.G. has been evaluated by Dr. Larry Burd, Director of the ND Fetal Alcohol Syndrome Center, and the evidence in Dr. Benson’s report indicates that his conclusions were that J.G. “meets criteria for an alcohol related neurodevelopmental disorder.”  Dr. Benson, the expert testifying on behalf of J.G., filed a report with the court which contained the following relating to his limitations and J.G.’s ability to complete his current form of treatment:

When I read the progress notes in his file, and note the language used by staff to describe his behavior it is clearly obvious that the staff are frustrated by him.  Furthermore, the staff do not seem to have any understanding of [J.G.’s] limitations.  It is noted several times that [J.G.] “lacks insight” (He has an IQ in the 70’s), that his journal entries are poorly written (He reads and writes at the 6th grade level), that his responses “lack substance” (He has brain damage) and that he constantly wants to be the center of attention (this is not atypical of folks with lower functioning).

I see no evidence that any of his providers are aware of the above limitations, nor that any accommodations have been made to his treatment plan to account for his specific limitations following the court ordered evaluation by Dr. Burd.  
This is like putting an average 6th grader into a college course and then blaming him for failing
.

[J.G.] reports he is on Stage 2 still because the other stages “go too fast” for him to “understand” the material.  I do not see this as lack of motivation; this is likely a very real statement.  He noted in one of the groups that the changes made to the group made it harder for him to understand, the response from staff was; “This is evidence of his tendency to gain group focus, his inclination to pilot the group into a bitch session and his preference for having things his way.”

. . . .

In completing several SDI evaluations for [J.G.] over the past several years since 2007, I have become increasingly concerned with the ability of the existing treatment program to understand and accommodate for his significant cognitive deficits. [J.G.] has documented diagnoses of Borderline Intellectual Functioning, a Learning Disability and brain damage from in utero alcohol exposure.  Though [J.G.] does not quite meet the diagnostic criteria for an Intellectual Disability/Mental Retardation (as his IQ score is above this cut off), let me be clear—his functioning is 
more similar to that population
 than it is to the “normal limits” functioning that is probably more in line with the majority of his peers in the NDSH Secure Services Program.

In reviewing his progress notes from the past year, I find repeated references to [J.G.] “lacking insight,” having a “surface” understanding of concepts, and handwriting in journals that is “illegible.”  These descriptions are 
exactly
 what can be expected of a person with [J.G.’s] cognitive capacity.  They are descriptive of his level of functioning, and should not be seen as signs of his lack of motivation or lack of desire for change.

Further comments indicate that his feedback “lacks substance[] and is basically just ‘Good Job,’ or repeating what others have said, and that he frequently wants to be the center of attention.”  Again, it would be 
expected
, that [J.G.] would not be capable of thorough evaluations of the performance of others, which is quite a high level of cognitive processing; and his desire for attention is characteristic of egocentricity common among those with lower intellectual functioning.

Furthermore, Individuals with low intellectual functioning require repetitive training (same topics and skills over and over, preferably in a small number of skills), hands on practice (role plays, etc.), frequent prompting and encouragement to follow through, and may need short term incentives to enhance motivation (i.e. use of reinforcement for cooperation and completion of homework, etc.)  They are often not capable of benefit[t]ing from insight oriented strategies (due to their difficulty taking the perspective of others), and learn better by focusing on the outcomes of behavior for themselves (avoiding consequences for negative behavior or gaining rewards for positive behavior).  It is noted in the records that he generally does well with role plays, and when given specific situations and asked what he would do.

In his 2002 article Dr. Jeremey Baumbach addressed some of the problems that arise when someone with FASD is in typical sex offender treatment programs, such as; “Many of the common behaviors reported in adolescents and adults who have sexually offended, which are generally interpreted as denial or resistance, may also result from neurological impairment.  For example, is this denial of the details of the offense, or the result of memory impairment?  Is this denial of responsibility or evidence of an inability to grasp cause and effect?  Is this denial of future risk or a sign or the person’s difficulty projecting self into the future?  Is this resistance to learning the sexual offense cycle, or is it difficulty with sequencing?  Is this non completion of assigned homework an indication of resistance, or does it result from deficits in executive functioning?”

I remain concerned that [J.G.], if put back into the same treatment program, run the same way, with the same providers who have the same level of understanding about his abilities, will never be able to complete the program to the point where the NDSH will be in favor of discharge
.

(Emphasis in original.)

[¶28] Dr. Benson’s recommendation included the following:

Should the court decide that [J.G.] remains a Sexually Dangerous Individual, and therefore not eligible for full discharge, I would suggest that we next explore if he is appropriate for a less restrictive environment.  That may be the CTC home on the NDSH grounds, or an alternative placement in the community paired with GPS monitoring, outpatient treatment and the teaching of independent living skills.

[¶29] Based upon the evidence before the court and the lack of any other existing programs in 2014, the court fashioned an order that required J.G. to be placed in the Community Transitional Center at the State Hospital.  Based on the statutory mandate of N.D.C.C. § 25-03.3-13, I would have upheld the authority of the trial court to so order.  The court was attempting to fashion an order that placed J.G. in a less restrictive alternative treatment while not requiring the executive director to create a program that did not exist.

[¶30] I, therefore, dissent.

[¶31] Carol Ronning Kapsner